THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES GOODWIN, Defendant-Appellant.

(No. 73-244;

Fifth District—January 14, 1975.

Robert E. Farrell and Michael Rosborough, both of State Appellate Defender's Office, of Mt. Vernon, and Dale F. Wolff, Senior Law Student, for appellant.

James W. Leaton, State's Attorney, of Jonesboro, for the People.

Mr. JUSTICE CREBS delivered the opinion of the court:

Defendant was indicted on a two-count indictment charging attempt murder and aggravated battery. He was tried in a jury trial in the Circuit Court of Union County and was convicted of aggravated battery, receiving a sentence of 2 to 5 years in the penitentiary. Notice of appeal was filed and, subsequently, petitioner also filed his pro se petition for post-conviction relief. Following a denial of this petition, an appeal was also taken in that cause, and defendant's motion to consolidate the appeals was allowed. Defendant contends; (1) that he was not proven guilty beyond a reasonable doubt; (2) that his trial counsel was incompetent; (3) that the trial court erred in denying defendant's request to inspect the file of a State's witness; and (4) that defendant was prejudiced by the calling of an assistant State's attorney as a rebuttal witness.

On May 28, 1972, the defendant and Charles Murray became involved in an argument during a bartender's picnic at the Wilderness Retreat which is a private club and picnic grounds near Lick Creek in Union County. When Bobby Murray, Charles' brother, attempted to stop the argument, Bobby received a severe cut extending from the back to the front of his neck. Bleeding profusely, he was immediately taken to the hospital where the wound was treated and closed with a number of stitches. After 2 days in the hospital and 6 weeks in bandages he was released from medical care. Defendant admits these facts but contends that the State's evidence was insufficient to prove that it was he who cut Bobby.

Charles Murray testified that after defendant's wife had called him some dirty names he got mad, but that Frank Wheaton, the owner of the club, had calmed him down. A short while later, he said, defendant came out of the clubhouse, and he too started calling him names. When defendant and Charles started towards each other, an acquaintance, Robert Fisher, grabbed Charles around the neck and pulled him back. Charles then noticed that his brother Bobby had also stepped in to break up the potential fight, but he, Charles, struggling under the hold of Fisher, was unable to see what happened. Fisher testified that when he saw the defendant and Charles standing about 6 feet apart shouting at one another he grabbed Charles from behind, and at the same time, he could see that Bobby had stepped in between Charles and the defendant. Fisher then saw defendant's hand go up as if he were going to slap

Bobby in the head, and when the arm completed its swing blood started to run out of Bobby's neck. Bobby immediately put his hand up to his neck and running away said, "He got me." Bobby testified that he had heard defendant's wife calling his brother names and had seen Wheaton break up that argument. Shortly thereafter, he said, defendant came out and he too started to curse Charles. As Fisher grabbed and held Charles, Bobby stepped in between them facing defendant. Neither he nor defendant said anything, but as Bobby started to turn away and walk off defendant grabbed him by the arm, turned him around, and that is when he felt the pain in his neck as if he had been cut by a knife. Blood immediately started to run all over him. He stated further that though he did not see a knife in defendant's hand, nonetheless, he knew defendant had cut him because defendant was the only person behind him.

A police officer testified that later, in the evening of the same day, he was asked by the sheriff to go to defendant's house and tell him the sheriff wanted to see him. Defendant answered the door and the officer gave him his message but did not tell him the reason why the sheriff wanted to see him. Defendant agreed to go and the officer waited while defendant dressed. As they started to leave the officer said that defendant handed him a pocketknife, saying, "I guess you want this knife." When the officer accepted it defendant said, "I ain't done nothing I'm ashamed of." The sheriff testified that the knife was a pocketknife with two or three blades and about 4 inches long. He also stated that the knife had been returned to defendant when he made bond.

Defendant's wife testified that Charles Murray had called her bad names but that she had not spoken to him. She was not present and did not see the incident involved here. Frank Wheaton testified for the defense, stating that he had heard both Charles and Bobby Murray cussing and going on. He also saw blood spurting from Bobby's neck, but he did not see what happened, nor did he see anything in defendant's hand. The defendant testified that when Charles Murray was calling him names Bobby stepped between them and said, "If you get on him I will have to get in too." He denied that he had slapped or hit Bobby or that he had come into any body contact whatsoever with him. He said that he did not know anyone had been hurt until someone came into the clubhouse and told him that Bobby was taken to the hospital. Defendant claimed that he did not have his knife with him that day. However, he admitted that when the police came to his house that evening, and even though he was not told why the sheriff wanted to see him, he did hand the knife to the officer, saying, "I guess you'll need this."

■■ On the question of proof of guilt defendant argues that since no one saw a knife in his hand the evidence is entirely circumstantial, and,

therefore, careful consideration must be given to any reasonable hypothesis of innocence. (*People v. Calhoun*, 4 Ill.App.3d 683.) The rule is that to support a conviction based on circumstantial evidence it is essential that the facts proved be not only consistent with defendant's guilt, but they must also be inconsistent with any reasonable hypothesis of innocence. However, such proof need not be beyond the possibility of a doubt (*People v. Branion*, 47 Ill.2d 70), and the manner of the death (or injury) and the means by which it was inflicted may be inferred from the circumstances proved. (*People v. Huff*, 29 Ill.2d 315.) But, as stated in the latter case, this rule does not contemplate that the trier of the facts is required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt. Also, it is the jury's province to draw inferences from the evidence and to determine the credibility of the witnesses and the weight to be given their testimony, and a jury's verdict will not be reversed on grounds of insufficient evidence unless there is a reasonable and well-founded doubt of guilt and the verdict is found to be palpably contrary to the weight of the evidence. *People v. Zuniga*, 53 Ill.2d 550; *People v. Irons*, 20 Ill.App.3d 125.

■■ Defendant would have us believe that the victim here was "somehow, by someone or something, accidentally injured during the excitement and grappling which occurred during efforts to prevent the impending fight," but that it was not the defendant. To accept this argument would be to ignore common sense and the natural inferences flowing from the evidence as a whole. There was no testimony regarding any grappling by the victim, Bobby Murray. Even according to defendant's testimony, Bobby merely stepped between the potential combatants as Charles was being pulled away by another individual. Defendant was seen swinging his arm at Bobby, and, though no one actually saw a knife in his hand, immediately following his swing blood was seen to spurt from Bobby's neck. And Bobby testified that it was defendant, and could only have been defendant, who pulled him around at which time Bobby felt the knife cut. In addition, there is defendant's admission that though he was not told why the police wanted to see him, nonetheless he delivered up his knife, stating he guessed that they would need it. Recognizing that it is solely within the prerogative of the jury to draw reasonable inferences from the evidence presented and to determine the credibility of the witnesses and the weight to be given to their testimony, we conclude that the facts proved were not only consistent with defendant's guilt, but they were also inconsistent with any reasonable hypothesis of innocence. Accordingly, we find that the trial court did not err in holding

that there was sufficient evidence to establish defendant's guilt beyond a reasonable doubt.

■■■ Defendant next contends that he was denied his constitutionally guaranteed right to competent counsel. First he contends that counsel should have moved to suppress the statements he made to the police about his knife, that he should have objected to their admission in evidence, and that he should not have delved further into them on cross-examination. Such statements were spontaneous and voluntary, and, not being elicited by custodial interrogation, they were admissible even under the *Miranda* principles. (*People v. Hicks,* 44 Ill.2d 550.) And failure to move to suppress voluntary statements cannot be regarded as neglect or incompetence on the part of counsel where to have done so would have been futile. (*People v. Dudley,* 46 Ill.2d 305; *People v. Asey,* 85 Ill.App. 2d 210.) Next, defendant complains that defense counsel himself introduced defendant's knife into evidence and also elicited testimony from the officer that defendant had told him, "I ain't done anything I'm ashamed of," even though the State had not brought out this fact on direct examination. We do not know what prompted such actions by counsel, but it is apparent from the record that he was faced with a very difficult set of facts upon which to build a defense. It was imperative that he make use of any trial tactic that he believed might be beneficial to his client. To bring out that he was not ashamed might have been intended to persuade the jury that he had not done anything wrong. By producing the knife, showing it to be an ordinary pocketknife, it might have been hoped that the jury would have looked with favor upon such openness and frankness. Certainly producing the knife itself added little one way or the other, for its existence was already noted in the evidence, and it could be argued, as defendant does, that the failure of the police to keep the knife showed how little importance they attached to it. It is well-settled that a review of counsel's competency does not extend to those areas involving the exercise of judgment, discretion or trial tactics (*People v. Witherspoon,* 55 Ill.2d 18), and we consider such rule applicable to defendant's above contentions. Defendant next complains of counsel's failure to make a closing argument. This was strictly a judgment decision based, apparently, on an assessment of the effectiveness of the State's argument, and under the circumstances here we do not believe it in any way demonstrates incompetence. Finally, the governing rule is that before a conclusion of inadequate representation can be reached it must appear that substantial prejudice resulted therefrom without which the outcome would probably have been different. (*People v. Gill,* 54 Ill.2d 357; *People v. Harper,* 43 Ill.2d 368.) It is relatively easy to say in

retrospect that a trial defense should have been conducted differently, but even if this were so in the case before us we cannot say that its outcome would probably have been different.

■■■ Defendant's two final contentions relate to a refusal of the court to allow defense counsel to examine a doctor's file and permitting an assistant State's attorney to testify in rebuttal. Defendant argues that the doctor's file should have been made available to him either under Supreme Court Rule 412 or under the principle that he is entitled to see a file which was used to refresh a witness' recollection. The doctor did have his file with him on the stand, but it was his personal file and not a report over which the State had possession or control, and Rule 412 is not applicable. However, it is true that a defendant is entitled to examine a file used by a witness to refresh his recollection whether he uses it before the trial or while on the stand. But a refusal to allow such an examination constitutes error only where it is possible that some discrepancy might appear therein which in turn might conceivably affect the verdict or punishment involved. (*People v. Scott*, 29 Ill.2d 97.) Here, the doctor merely testified to the medical facts of the victim's injury and the treatment given him. We find that under such circumstances the refusal to allow an examination of the file could not have affected the verdict, and the error, if any, was harmless. The assistant State's attorney who was called to rebut Wheaton's testimony was present at the trial but not a participant. He may have violated an order excluding witnesses, but to allow such a witness to testify is within the discretion of the trial court. (*People v. Farnsley*, 53 Ill.2d 537.) The witness actually supported instead of rebutting Wheaton's testimony, and the court granted defendant's motion to strike and instructed the jury to disregard the testimony. We find no prejudice to defendant in such procedure.

The judgment of the Circuit Court of Union County relative both to defendant's conviction of aggravated battery and the dismissal of defendant's post-conviction petition is affirmed.

Affirmed.

EBERSPACHER and CARTER, JJ., concur.