THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee *v.* BILLY JOE CASTILE *et al.*, Defendants-Appellants.

(No. 75-26;

Fifth District—December 19, 1975.

Mudge & Riley, of Edwardsville, for appellants.

Nicholas G. Byron, State's Attorney, of Edwardsville (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

This is an appeal by the defendants, Billy Joe Castile, Fred Fairfield and Paul Dean Fisher, from the judgments of conviction entered by the circuit court of Madison County on jury verdicts of guilty to the charge of burglary, the respective sentences entered thereunder, and the denials of defendants' written motions for a new trial. Billy Joe Castile was sentenced to three to nine years' imprisonment, while Fred Fairfield and Paul Dean Fisher were each sentenced to one to three years' imprisonment.

On appeal each of the defendants contends that his conviction must be reversed. First, each defendant claims that the evidence presented by the prosecution cannot sustain their convictions. The following review of the evidence presented by the State in the trial court belies this claim; defendants offered no evidence, and their motions for directed verdicts at the close of the State's case were denied.

John Price, an employee of the Super X Drugs Company, testified that on Sunday, June 10, 1973, he was working as a pharmacist and assistant manager for the company's store in the Nameoki Shopping Center in Granite City. He stated that there were only two entrances to this store. One entrance was situated in the front of the store, facing Nameoki Road, and the other entrance was a metal door leading to the delivery area behind the store. The outside portion of this door was just a "blank side" containing no doorknobs or keyholes. The door fitted flush into an angle iron facing. It was secured by two locks and a metal bar on the inside. According to Price there was no means of opening this door from the outside.

During the afternoon of June 10, 1973, Price, after locking the rear door to the store, gave the key to Harold Vaughn. This key normally hung on a nail in the stock room. Prior to closing Price received a telephone call advising him that someone was hiding in the store. Price testified that he never saw such person. When Price left the store between 6:10 and 6:15 p.m., all the customers and other employees had left. Price exited through the front door. After locking the front door Price drove home.

As Price left the store he was being observed by Sergeant Joe Nemeth of the Granite City Police Department, who was watching the pharmacy through a pair of binoculars from a doctor's office across Nameoki Road. Nemeth was operating as part of a police surveillance team, which had

been set up after Price had notified Larry Keshner, a former Assistant State's Attorney, of an impending burglary.

Approximately ten minutes after Price drove away (6:30 p.m.), Sergeant Nemeth observed a male subject inside the pharmacy. This man was wearing a white pharmacy-type jacket. He fit the general description of defendant Fairfield; he was a white male, about five feet nine inches tall with black hair. After approaching the front of the store, the subject went over to the safe located near the display window, remained there for about two minutes, and then returned to the rear of the store.

The remainder of the police surveillance team watched the area behind the store. Captain Francis McManus, chief of detectives, moved into position behind the drug store around 6:30 p.m. He was in a parked car approximately 300 yards from the rear exit to the store. Two other officers, Glen Wright and Harry Mitchell, took up positions about 400 feet from the rear of the store about 7 p.m.

Around the rear of the store was a fenced in area measuring approximately 40 feet by 60 feet. The fence was constructed in such a manner that it obstructed the police from viewing the rear door of the store. The police were, however, able to observe anyone entering into the enclosed area. The enclosed area was bordered by the rear wall of three establishments other than the store in question. Thus, in addition to the rear door of the pharmacy, were the rear doors of Kroger's, a laundromat, and a beauty shop.

At approximately 6:40 p.m. Captain McManus observed what appeared to be three subjects walking alongside the fence. They entered the enclosed area behind the fence and disappeared from his view. One subject was carrying something draped over his shoulder. At approximately 7:25 p.m. Sergeant Nemeth saw the individual in the pharmacy jacket approach the front window for a second time. Shortly thereafter, Captain McManus, who had not seen anyone else go behind the fence, observed three subjects, similar in appearance to those who an hour earlier entered the area, emerging from behind the fence. At the same time Officers Mitchell and Wright, who had not previously observed anyone moving around in the enclosed area, observed three subjects moving around near the rear of the pharmacy. Although Mitchell and Wright could not see the rear door of the pharmacy, they were able to see the short entrance way leading to the rear door of the pharmacy. The police, in radio contact, then "closed in" on the area.

While Captain McManus and Officers Mitchell and Wright drove up to the enclosed area behind the store, Sergeant Nemeth approached the front of the store. Nemeth checked and found the front doors locked.

Officers Wright and Mitchell placed the three subjects, later identified as the defendants, under arrest.

On defendant Fairfield the police found a screwdriver, a key with a green plastic tag, and a pair of brown jersey gloves. The store manager, Edward Wisniewski, identified this key as the key to the rear door to the pharmacy. Sergeant Nemeth testified that this key opened the rear door to the pharmacy, but did not fit any other lock in the building. After placing the defendants under arrest Officer Wright checked the doors within the fenced in area and discovered that the rear door of the pharmacy opened upon his pushing it. Upon opening this door the police discovered a large blue duffle bag, a green flight bag, and a black bag. These bags contained boxes and bottles of capsules and pills which were introduced into evidence. Also found were a number of tools, a large prybar, and a white pharmacist's jacket. Pry marks discovered on the cabinet where the narcotics were kept could have been made by a screwdriver about the size of that recovered from defendant Fairfield. A thorough search of the store failed to reveal the presence of anyone else or that anything was stolen. The safe in the front of the store was found unlocked, leaving $1,200 readily accessible.

Wisniewski testified that neither the tools nor the duffle bag were the property of the drug store. Price testified that these items were not present when he closed the store. He further testified that the drugs found in the bags by the police were in an *unlocked* cabinet when he left. Wisniewski testified that he had given no one permission to remain in the store after closing. Price testified that while he had given the key to Harold Vaughn and had been informed that someone was hiding in the store, he did not give any of the defendants express permission to enter the store after closing.

The primary thrust of defendants' first argument is that the foregoing evidence was insufficient to place any of the defendants in the store. We disagree.

■■■ While we take cognizance of the lack of any direct evidence showing that any of the defendants entered the store, we find the circumstantial evidence herein present sufficient to sustain the convictions. The rule with respect to circumstantial evidence was reiterated by this court in *People v. Goodwin,* 24 Ill.App.3d 1090, 1094, 322 N.E.2d 569, 572. Therein we stated,

> "The rule is that to support a conviction based on circumstantial evidence it is essential that the facts proved be not only consistent with defendant's guilt, but they must also be inconsistent with any reasonable hypothesis of innocence. However, such proof need not

be beyond the possibility of doubt (People v. Branion, 47 Ill.2d 70), and the manner of death (or injury) and the means by which it was inflicted may be inferred from the circumstances proved. (People v. Huff, 29 Ill.2d 315.) But, as stated in the latter case, this rule does not contemplate that the trier of the facts is required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt. Also, it is the jury's province to draw inferences from the evidence and to determine the credibility of the witnesses and the weight to be given their testimony, and a jury's verdict will not be reversed unless there is a reasonable and well-founded doubt of guilt and the verdict is found to be palpably contrary to the weight of the evidence. People v. Zuniga, 53 Ill.2d 550; People v. Irons, 20 Ill. App.3d 125."

The jury in the instant case had before it testimony which, if believed, indicated that the rear door to the store was locked at 6:10 p.m., that such door could only be opened from the inside, that the key to this door was given to one Harold Vaughn, that the police observed three individuals enter the enclosed area, that one hour later, having not observed anyone else enter the enclosed area, the three defendants emerged therefrom, and that a key to the back door of the store, a pair of gloves, and a screwdriver were found on the person of one of the defendants when they were arrested. Combined with this testimony is the testimony of Captain McManus that the defendants were similar in appearance to the three subjects who had entered the enclosed area an hour earlier and the testimony of Officer Wright which, by implication, eliminated the possibility that one of the other doors to the enclosed area was open. The theory of a fourth party being involved and escaping police surveillance cannot be employed by the defendants to exculpate themselves. The absence or presence of a fourth party is irrelevant to the defendants' convictions since the possession of the key to a lock on the inside of the locked rear door of the pharmacy placed them in concert with someone who did enter, in this case remain concealed, in the pharmacy with the apparent intent to commit a theft therein. Our review of the record reveals no *reasonable* hypothesis of innocence consistent with the evidence presented in the trial court which would justify our reversal of the jury's verdicts of guilty.

Next, the defendants each contend that their convictions of burglary cannot be sustained since a party in charge of the building allegedly burglarized knowingly and voluntarily allowed someone to remain within the premises after closing, and did so knowing that such person was there

for the purposes of a theft. They argue that "it is an illogical extension to say that burglary lies where the party in authority knows of the entry, knows of the remaining in a business after closing, and knows the intention of the person remaining to be theft." While defendants attempt to distinguish several appellate cases, no authority is cited by the defendants in support of their argument.

■■ We find it unnecessary to address the merits of this argument since, as noted in the State's brief, this argument is premised on defendants' assumption that John Price was the owner of the pharmacy. Instead, Price was an assistant manager. The true owner was Super X Drugs, *d.b.a.*, Gasen Drugs of Illinois. John Price, as assistant manager, had no more authority to consent to an entry for the purpose of theft than he did to steal merchandise himself. The fact that Price had access to keys to the premises did not confer upon him the ability to authorize entry for the purpose of theft. In the absence of such authority, the defendants' argument that their entry was authorized must fail.

■■ Before addressing the defendants' final contention we note in passing that they question the propriety of the trial court's denial of their request to tender a specific instruction to the jury. The defendants did not specify this issue either in the "Issues Presented for Review" section of their brief or in the "Points and Authorities" section of their brief. Furthermore, the defendants each failed to allege any instructional error in their three separately filed post-trial motions. Under these circumstances we consider any instructional error waived. *People v. Hicks*, 133 Ill.App.2d 424, 273 N.E.2d 450; *People v. Ledferd*, 94 Ill.App.2d 74, 236 N.E.2d 19.

The defendants' final contention is that the trial court erred in "pronouncing grossly disparate and unfair sentences without setting forth a rational basis to justify those sentences and without there being a rational basis in evidence to justify the different sentences imposed." Only defendants Fisher and Castile joined in urging this contention. Defendant Fisher, who received the minimum sentence of one to three years, contends that he should have been granted probation as recommended by the author of the presentencing report. Defendant Castile contends that his background entitles him to a sentence at least as lenient as that received by defendant Fairfield, who received the minimum sentence of one to three years; and that there was no rational basis for the trial court to amend his announced sentence of three to eight years to a sentence of three to nine years.

■■ Regarding defendant Fisher's contention that he should have been granted probation our review is limited to whether the trial court abused

its discretion. (*People v. Rednour*, 24 Ill.App.3d 1072, 322 N.E.2d 492.) Defendant Fisher was convicted of burglary, a Class 2 Felony (Ill. Rev. Stat. 1973, ch. 38, par. 19—1). The evidence presented in the trial court revealed that this crime was carefully planned, with remarkable attention to detail. This evidences the defendants' premeditation and their organization. The object of the crime was to acquire a large quantity of prescription drugs for illegal distribution. While no violence was involved, the drugs discovered near the rear door of the pharmacy had the potential, when improperly administered, to cause considerable harm and suffering. There was no showing that these drugs were either needed by defendant Fisher or that they would not be dispensed indiscriminately to the public. Thus, while we view the defendant's background favorably, we cannot say, in view of the nature and circumstances of the offense, that the trial court abused its discretion in denying probation.

■■ The seriousness of the offense is equally relevant to the sentence imposed on defendant Castile. In addition, the record depicts a background much less favorable than that of defendant Fisher. At the time of sentencing defendant Castile was serving a one-year sentence of probation. That sentence arose out of an original charge of reckless conduct, aggravated battery, disorderly conduct, and damage to property. The presentencing report also revealed that defendant Castile was sentenced to a term of probation as a juvenile and had in addition received a sentence of one year to one year and a day for burglary in 1967. Cognizant of these facts the trial court initially imposed a sentence of three to eight years, which was immediately corrected to three to nine. This term was in excess of the term imposed on either the other defendants. While defendant Fairfield had an even less desirable background, the trial court saw fit to impose a lower sentence in view of evidence that defendant Fairfield was suffering from polycistic lung disease, a condition Fairfield characterized as "terminal." Fairfield's doctor had recommended constant medical care. Fairfield's medical condition provides a rational basis for the different sentences imposed upon the two defendants. Furthermore, since the defendants were jointly tried there can be no claim that the disparate sentences were the result of defendant Castile's exercise of his constitutional rights; all exercised the same rights.

■■ We also believe that the ultimate sentence imposed on Castile by the trial court, three to nine years' imprisonment, was justified. In reconsidering the sentence it initially pronounced for Castile, three to eight years' imprisonment, the trial court chose to maintain the minimum sentence of three years by restoring the proper one-to-three ratio between the minimum and maximum sentence. To accomplish its goal the trial

court increased Castile's maximum sentence to nine years. We find nothing improper with either the sentence ultimately imposed on Castile or the procedure employed in arriving at such sentence.

Having found each of defendants' contentions to be without merit we affirm the judgments of conviction entered by the circuit court of Madison County against each of the defendants.

Affirmed.

JONES and G. MORAN, JJ., concur.