THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
IVAN TODD THOMAS, Defendant-Appellant.

Fourth District    No. 4—89—0076

Opinion filed November 30, 1989.

Daniel D. Yuhas and Gloria A. Carroll, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

Following a jury trial, defendant was convicted of aggravated battery (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(b)(1)) and acquitted of armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)). He appeals, contending (1) evidence of a statement which was purportedly related to plea bargaining was improperly admitted at his trial; (2) in closing argument, the prosecutor improperly defined the concept of reasonable doubt to the jury in such a manner as to lessen the State's burden of proof; and (3) the State failed to prove beyond a reasonable doubt that a deadly weapon was used in the battery of which he was convicted.

At defendant's trial, the victim, who is a haircutter by profession, stated that on the evening of December 19, 1987, he attended a Christmas party at the residence of Carol Wright. Several persons at the party were acquaintances whom the victim had met while a student at the Bloomington Academy of Beauty Culture. Defendant was among the guests at the party. The victim stated that during the course of the party, he saw defendant with a knife and that defendant talked about trading the knife for a hair-shaping razor blade, which is used for thinning hair. Defendant stated that he knew that Carol Wright possessed such a razor blade. During the party, the victim briefly saw the defendant in possession of a hair-shaping razor blade in the back bedroom of the Wright residence.

The victim further testified that he left the party at approximately 10:30 or 11 p.m. in the company of defendant and Paul Childs. The victim agreed to give defendant and Childs a ride to another party in the victim's car. The defendant sat in the front seat, and Childs sat in the middle of the backseat as the victim drove the car. There was no one at the scene of the party which defendant and Childs wanted to attend, and the victim therefore decided to return to the party at Wright's residence. En route, the victim "stop[ped] by a girl's house" at the request of defendant and Childs. When they arrived at that location, Childs left the car and was gone for a maximum of 10 to 15 minutes. After Childs left the car, the victim discovered that a bottle of vodka which had been in his car was missing. The victim frisked Childs upon his return, found the vodka in his possession, took it from him, and placed it by the driver's door of his car. When the victim took the bottle of vodka away from Childs, Childs claimed that it was his. The victim stated that he knew the vodka was his (the victim's) because it was still in a bag bearing the name of the store at which he had purchased it, and he knew that Childs did not have the vodka when he got into the car.

The victim stated that after recovering his bottle of vodka, he began to drive his car to the Wright residence. After driving a distance of one-half block, defendant pulled out "something like a knife," put it against the victim's throat and told the victim to take him and Childs to "Sunnyside." The defendant stated that if the victim did not cooperate, he would get hurt. The victim thereupon drove for a further distance, while the defendant continuously held the sharp object against his throat. The victim pulled the car over to a curb a couple of blocks from the Law and Justice Center. At that point, defendant turned off the ignition and grabbed the keys to the victim's car. The victim stated that at the same time, he grabbed the right hand of

defendant, which was holding the knife, hit it against the steering wheel, and squeezed out of the car. The victim did not immediately know what happened to the object which the defendant was holding.

After squeezing out of his car, the victim ran two blocks to the police station and reported the incident. He then returned to his car in the company of a police officer. They discovered that the glove compartment of the victim's car had been ransacked and that the bottle of vodka was missing.

The victim further testified that about a week after the incident involving the defendant, a friend of his discovered a "hair shaping blade" under the seat of the victim's car. This was the same type of hair-shaping blade which he saw in defendant's possession during the party at the Wright residence. The victim further stated that the blade was not in his car prior to the evening of the party at the Wright residence and that when the victim's friend discovered the blade in the victim's car, it had a dried red substance on it which looked like blood.

The victim also testified that when he got to the police station, he noticed that his shirt had bloodstains on it and that there was blood on his neck. He further stated that after defendant placed the sharp object against his neck, he felt pain.

On cross-examination, the victim testified that he never saw defendant with the bottle of vodka. He further stated that he did not know what the object was which the defendant held to his neck. The victim further testified that while defendant held the object against his neck, defendant also had his other hand on the victim's neck. The victim acknowledged that the pain which he experienced at the time could have been caused by defendant's other hand, and that the cuts which he sustained could have been inflicted during the struggle just before he squeezed out of his car. The victim also acknowledged that he had had quite a bit to drink on the evening in question. The victim further testified on cross-examination that the defendant was not wearing gloves on the night of the party at the Wright residence.

On redirect examination, the victim stated that the injury to his neck consisted of both straight and jagged cuts, and that the straight cuts were "razor fine." He further stated that a couple of weeks after the incident involving the defendant, he discovered that a coat which had been in his car on that evening was also missing.

When asked on re–cross-examination if the cuts on his neck could have been caused by fingernails, the victim stated:

> "I don't think so, I don't think so for the fact that they were
> longer. When you get scratched with a fingernail, it more or

less scrapes instead of cuts. It was a clean cut. I don't think it was from fingernails."

Also testifying on behalf of the State was Vickie Walton. She stated that she saw defendant with a knife at the party at Carol Wright's residence on December 19 and 20, 1987. Walton testified that the knife had a dark handle and a long blade. She further testified that the bloodstained object found in the victim's car was a razor blade similar to the ones used in the razors at the beauty school which she attended. She also recalled a conversation at the party at Wright's residence in which defendant offered to trade Carol Wright a knife for a razor blade similar to the blade discovered in the victim's car. Walton further testified that she did not see cuts on the victim's neck while he was at the party at Wright's residence.

On cross-examination, Walton was impeached with a 1986 forgery conviction.

Detective Jeff Sanders of the Bloomington police department stated that the victim gave him the blade which he recovered from his car. Sanders further testified that the substance on the object appeared to be dried blood.

On cross-examination, Sanders stated that no tests of the dried blood on the blade found in the victim's car were performed, and that he discovered no obviously apparent fingerprints on that object.

Following Sanders' testimony, the court admitted into evidence the razor blade which the victim discovered in his car.

Detective Mike Jordan of the Bloomington police department testified that when he observed the victim shortly after midnight on the morning of December 20, 1987, he noticed some fresh cuts to his neck area. The cuts appeared to have been made "by a sharp instrument of some sort."

On cross-examination, Jordan stated that he discovered no knife or razor blade when he searched the victim's car for evidence on the morning of December 20. He further stated that when he took the victim to the hospital on that morning, he required no stitches. Jordan also stated that the victim told him that he got cut during the struggle just before he escaped from his assailant.

At the conclusion of the State's case, the court admitted into evidence a transcript of a September 20, 1988, hearing on a motion of the defendant's court-appointed counsel for leave to withdraw. The prosecutor published to the jury a portion of the transcript in which the defendant stated: "I know I am not guilty of nothing but aggravated battery ***."

The court denied a motion for a directed verdict as to both of the

offenses with which defendant was charged. The defendant presented no evidence.

Following a sentencing hearing, the court sentenced defendant to five years' imprisonment on the aggravated battery count of which he was found guilty.

We first consider defendant's contention that there is insufficient evidence to support his aggravated battery conviction, because the State did not prove beyond a reasonable doubt that he utilized a deadly weapon in committing the aggravated battery of which he was convicted.

■ In determining whether the evidence is sufficient to establish a defendant's guilt beyond a reasonable doubt, the pertinent inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have concluded that the evidence establishes the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.

■ As both parties point out, under the indictment filed in this cause, evidence that defendant used a deadly weapon was necessary in order for the battery which defendant committed to be enhanced to the more serious offense of aggravated battery. (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(b)(1).) Use of a deadly weapon during the commission of a battery may be established by circumstantial evidence if there is some physical manifestation of a weapon (*People v. Parks* (1977), 50 Ill. App. 3d 929, 365 N.E.2d 1339) or some other evidence from which the use of a weapon may be inferred. *People v. Partee* (1987), 157 Ill. App. 3d 231, 511 N.E.2d 1165, *cert. denied* (1988), 484 U.S. 1072, 98 L. Ed. 2d 1006, 108 S. Ct. 1043; *People v. Goodwin* (1975), 24 Ill. App. 3d 1090, 322 N.E.2d 569.

■ In the present case, there is ample circumstantial evidence to support a conclusion by a rational trier of fact that the evidence establishes beyond a reasonable doubt that the defendant used a deadly weapon in committing the battery of the victim. The victim testified that the defendant pulled out an object and placed it against his throat. In his testimony, the victim repeatedly referred to the object as a knife. The cuts on the victim's neck appear to have been caused by a long, sharp object. The discovery of a hair-shaping blade with dried blood on it in the victim's car approximately one week after the battery would not in itself be sufficient to establish beyond a reasonable doubt that defendant used a deadly weapon in committing the battery. However, this was a factor which the jury properly could

have considered together with the other evidence in concluding that defendant used a deadly weapon in committing the battery of which he was accused.

We next consider whether evidence of a plea-related statement was improperly admitted at defendant's trial. Admitted into evidence at defendant's trial was a transcript of a September 12, 1988, pretrial hearing on a motion by defendant's counsel for leave to withdraw. The prosecutor read a portion of this transcript to the jury. The part of the transcript which was read to the jury included the following response by defendant to the court's query as to whether he desired the appointment of other counsel:

> "Yes, like—because I really don't want to perform this myself. All I really want is somebody to work with me, you know, on my case, you know. That is all I want, you know? I feel as though Mr. Butler—evidently he didn't have the time or the patience to sit down and look at my case. It wasn't like I wanted to represent myself, because I am no lawyer, you know? I just wanted, you know, justice, you know? I mean I been up here for three pretrials and, you know, all this stuff ain't necessary, you know, *especially when I know that I am not guilty of nothing but aggravated battery, you know?*" (Emphasis added.)

Defendant contends that when considered in the context of his previous statements to the court at other pretrial hearings, and a letter which he wrote to the State's Attorney's office, this statement was a part of a plea-related discussion and was thus improperly admitted into evidence in violation of Supreme Court Rule 402(f). 107 Ill. 2d R. 402(f).

The defendant observes that appearing in the common law record is a copy of a letter which he wrote to the McLean County State's Attorney in May 1988. In that letter, he offered to "take a Battery [*sic*] Class A, B, C," with a sentence of "3yr. intens [*sic*] [intensive probation] and 4 mt. in here and some commt. savist. [*sic*] [community service] work," and further stated, "I want to pay his [the victim's] Doctor Bill." The defendant asserts that when considered in the context of this statement and his other statements to the court at both prior and subsequent pretrial hearings, his September 12 admission was part of an ongoing attempt to engage the trial court in the plea negotiation process when he felt that his counsel was not participating. Defendant notes that the State referred to his September 12 statement in its opening statements, read it into evidence over defense objections, and referred to it extensively in closing argument. The defendant maintains that the admission of the purported plea-re-

lated statement which he made at the September 12, 1988, hearing denied him a fair trial.

The State asserts that at the September 12, 1988, hearing, defendant did not request that the trial judge "make a deal," did not convey to the trial judge any offer to plea bargain, did not address the assistant State's Attorney who was present, and did not testify as to what his expectations were. The State argues there was thus at that time no explicit manifestation of a subjective intent on the part of the defendant to plea bargain.

The State further asserts that a defendant's actions over a five-month period are not relevant in determining whether a statement on the part of a defendant was plea related. The State maintains that even if the September 12, 1988, statement is considered in the context of the defendant's statements before and after the September 12, 1988, hearing, defendant still did not manifest an expectation of negotiating a guilty plea. The State observes that defendant writing to the State's Attorney a letter setting forth the terms under which he would be willing to plead guilty, as well as his previously pleading guilty to a felony, demonstrates that he knew that the State's Attorney, and not the trial judge, was the person with whom to plea bargain. The State also argues that the defendant may have had other possible motives for making the admission here at issue, such as a desire to be released on a lower bond. Finally, the State asserts that even if defendant had a subjective expectation of negotiating a guilty plea on September 12, 1988, that expectation was unreasonable under the circumstances of this case.

■■ Supreme Court Rule 402(f) provides:

"Plea Discussions, Plea Agreements, Pleas of Guilty Inadmissible Under Certain Circumstances. If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." (107 Ill. 2d R. 402(f).)

In determining whether an admission by a defendant was plea related and is therefore inadmissible, a court must first inquire whether the accused demonstrated a subjective expectation to negotiate a plea. Second, the court must inquire whether this expectation was reasonable under the totality of the objective circumstances. Where a defendant manifests no explicit subjective expectations in making the statement at issue, the objective circumstances surrounding the state-

ment take precedence in determining whether it was plea related. (*People v. Friedman* (1980), 79 Ill. 2d 341, 403 N.E.2d 229.) Before a statement may be characterized as plea related, "it must contain the rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter a plea of guilty in return for concessions by the State." *Friedman*, 79 Ill. 2d at 353, 403 N.E.2d at 236.

■ Assuming, without deciding, that the events which preceded and followed defendant's September 12, 1988, admission may properly be considered in determining whether that statement was plea related and is thus inadmissible, there is nothing in the record to support defendant's contention that this admission was plea related. Defendant provided no explicit indication of his subjective expectations in making this admission, and the objective circumstances do not support a conclusion that it was plea related. All of the defendant's other statements to the court on which defendant relies focus on either dissatisfaction with his counsel or requests for bond reduction. Likewise, in the September 12 statement, the defendant expressed a desire to obtain another attorney who would work more closely with him in the preparation of his case. Moreover, neither this statement, nor any of the defendant's other statements *to the court*, contain any indications of the terms on which the defendant *was willing* to plead guilty. In view of both his letter to the State's Attorney setting forth the terms on which he would plead guilty to battery and his prior plea of guilty to the offense of burglary, defendant certainly knew that the State's Attorney, and not the trial judge, was the proper person to approach in order to begin plea negotiations. Also, the trial judge at no time manifested a willingness to enter into plea negotiations with defendant.

This court's recent decision in *People v. Connolly* (1989), 186 Ill. App. 3d 429, 542 N.E.2d 517, does not support defendant's position that Rule 402(f) was violated in the present case. *Connolly* involved an inquiry by a suspect to a deputy sheriff as to whether " 'deals' " were made in the county. (*Connolly*, 186 Ill. App. 3d at 433, 542 N.E.2d at 520.) This court held that testimony concerning the suspect's inquiry was improperly admitted because the jury could have regarded the inquiry as an admission of guilt, despite the defendant's protestations of innocence.

The inquiry at issue in *Connolly* could have had no purpose other than to serve as an overture for the beginning of plea negotiations. Furthermore, the inquiry was directed to a law enforcement officer. In the present case, the admission occurred in a conversation with the trial judge concerning the defendant's desire for the appointment of

other counsel. Also, unlike in the present case, the record in *Connolly* apparently contained no indications that the defendant was familiar with the plea negotiation process.

In sum, there are neither subjective nor objective indications that defendant's admission was a plea-related statement. Consequently, its introduction into evidence did not deny defendant a fair trial.

During closing argument, the prosecutor stated:

> "Another instruction that you need to talk about, need to think about, ladies and gentlemen, is the definition of the burden of proof. The State must prove its case beyond a reasonable doubt. That is sort of textbook law. I think we all know about that. I submit to you folks that the operative word in that particular definition is the word 'reasonable.' We don't have to prove our case beyond any doubt or beyond a shadow of a doubt, just beyond a reasonable doubt. What that means, ladies and gentlemen, is that any doubt which you have which would defeat the State's theory I submit must be reasonable. It's got to fit together, it's got to make sense in light of all the other evidence in the case."

Defendant contends that in making this statement, the prosecutor created a presumption in favor of the State, which the jurors' reasonable doubts had to defeat in order for defendant to be acquitted. The defendant also asserts that these comments may have improperly shifted the burden of proof from the State by requiring either the defense or the jurors' reasonable doubts to defeat the State's theory of the case.

The State asserts that any error in the prosecutor's comments regarding reasonable doubt was waived by the defendant's failure to object to these comments at trial or to specify them in his post-trial motion. The People further argue that these comments do not represent an attempt to define reasonable doubt but are merely an argument regarding the weight of the evidence. The State also contends that the prosecutorial comments at issue did not reduce the State's burden of proof, and that even if these comments were improper, they did not substantially prejudice the defendant. In support of the latter contention, the State relies on (1) the jury instructions and the portions of the arguments of counsel emphasizing the State's burden of proof and the defendant's presumption of innocence and (2) the presumption that the jurors followed the court's instructions.

■■ ■ It is well established that the concept of reasonable doubt needs no definition and that is improper for the court or counsel to attempt to define reasonable doubt to the jury. (*People v. Weinstein*

(1966), 35 Ill. 2d 467, 220 N.E.2d 432; *People v. Eddington* (1984), 129 Ill. App. 3d 745, 473 N.E.2d 103.) The comments here at issue could have been construed by at least some jurors as implying that the State's evidence—or the State's theory of the case—enjoys a presumption of veracity, which the defendant must defeat or negate if he is to be acquitted. Because of the damaging effect which statements like this might have on such fundamental concepts of justice as the defendant's presumption of innocence and the prosecution's burden of establishing beyond a reasonable doubt all elements of the charged offenses (see *Weinstein*, 35 Ill. 2d 467, 220 N.E.2d 432), we must consider whether these comments require reversal of defendant's conviction under the plain error exception to the waiver doctrine. 107 Ill. 2d R. 615; see *People v. Ellis* (1985), 134 Ill. App. 3d 924, 481 N.E.2d 320.

■ We conclude that although the prosecutorial remarks here at issue at least bordered on impropriety, they did not contribute to the jury's verdict to the extent that reversal of the defendant's conviction is required. The evidence in this case was largely undisputed. There was no evidence which contradicted the victim's testimony that a battery occurred or the victim's identification of the defendant as his attacker. Indeed, the only matter seriously disputed was whether the defendant used a deadly weapon in committing the battery. The evidence does not reasonably support a conclusion other than that a sharp metal object caused the cuts on the victim's neck. Because there was overwhelming evidence of defendant's guilt, we hold the prosecutor's comments concerning the concept of reasonable doubt and the State's burden of proof did not constitute plain error.

The defendant's aggravated battery conviction is affirmed.

Affirmed.

LUND and KNECHT, JJ., concur.