# Illinois Official Reports

## Appellate Court

---

### *People v. Smith*, 2021 IL App (5th) 190066

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL SMITH JR., Defendant-Appellant. |
| District & No. | Fifth District<br>No. 5-19-0066 |
| Filed | November 1, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Jackson County, No. 18-CF-303; the Hon. Ralph R. Bloodworth III, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Adrienne E. Sloan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Joseph A. Cervantez, State's Attorney, of Murphysboro (Patrick Delfino, Patrick D. Daly, and Max C. Miller, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE VAUGHAN delivered the judgment of the court.<br>Justice Wharton specially concurred, with opinion.<br>Justice Cates dissented, with opinion. |

**OPINION**

## I. BACKGROUND

This case arises from allegations that coins, pain medication, and jewelry were stolen from Michael Whittington's apartment on July 29, 2018. After an officer viewed surveillance footage of the apartment building, defendant was suspected as the offender. On August 1, 2018, defendant was charged with residential burglary in knowingly and without authority entering into the dwelling of Whittington, with the intent to commit therein a theft (720 ILCS 5/19-3(a) (West 2018)).

On October 29, 2018, defense counsel filed a motion *in limine* to preclude the introduction of the two nonconsecutive iPhone clips, which depicted defendant walking away from Whittington's apartment after touching the doorknob and then exiting Whittington's apartment about 20 minutes later. He argued that the clips were unduly prejudicial without admitting the full original surveillance video, as the jury would likely speculate as to what may or may not be on the rest of the original surveillance video. The motion also argued that the clips violated the best evidence rule pursuant to Illinois Rules of Evidence 1001-1003 (eff. Jan. 1, 2011) because they were not duplicates where the 20- to 30-second clips did not "accurately reproduce the original" as required in Illinois Rule of Evidence 1001(4) (eff. Jan. 1, 2011).

Before trial, the court heard argument on defendant's motion *in limine* regarding the iPhone clips. Defense counsel noted that the State did not provide the original surveillance video to the defense in discovery, and from talking with the State that morning, it was due to the State not being provided the original video by law enforcement. Counsel argued the two 20- to 30-second clips are prejudicial to defendant because there is no video of what happened in between the two clips, what happened before that time, or what happened after that time. Counsel acknowledged that edited clips of long videos are often admitted into evidence but asserted that the other side always has the original to use if necessary. Without the original, the jury is left to speculate as to what might be on the full surveillance video. Counsel further argued that the clips violated the best evidence rule because they are not the original nor are they duplicates under Illinois Rule of Evidence 1001(4) (eff. Jan. 1, 2011).

At that time, the State had no response but requested the court to reserve its ruling until it could have the witness who was to authenticate the video come testify the next morning, so the court could be fully informed of the foundation of the clips. Defense counsel and the court agreed.

The following morning—immediately before trial—the State called Pieter Schmidt to testify. Schmidt owned the apartment building in which Whittington and defendant lived. Schmidt stated that the apartment complex had a video surveillance system. He testified to his familiarity with the system, noting that he had previously reviewed surveillance video footage by pulling up the surveillance screen then selecting the appropriate icon to go forward, backwards, or to pick a specific date. He explained that there are four cameras that automatically record and save to a DVR for 48 hours. The cameras are positioned to look through the office windows into the hallway, to look down the hallway, and to look at the parking lot. Schmidt testified that the recordings are time-stamped and cannot be altered. Schmidt averred that this matter was the first time he had to retrieve surveillance video footage since installing the system the previous spring. He stated that he knew the video surveillance

was functioning properly on July 29, 2018, because the footage for that date was available for review.

¶ 7    Schmidt testified that, after Whittington left him a message that someone broke into his apartment and "robbed" him, he viewed the surveillance footage for July 29, 2018, for some time earlier than 1:53 p.m. until 2:24 p.m. Once Schmidt arrived at the apartment building, Whittington gave him a police officer's card and informed him that the officer was interested in knowing if the video surveillance system worked. Schmidt verified that, based on his knowledge of how the system worked, the video displayed a fair and accurate depiction of what occurred in front of the cameras at that time. When asked if he was able to copy the footage, Schmidt stated, "I'm not competent enough apparently to do that. And we tried and we could not get it to download on a flash drive. So we recorded it on a cellphone. Basically I think they call that a screenshot."

¶ 8    Schmidt testified that he and his wife recorded a couple of clips that they thought were important on his wife's iPhone that were subsequently e-mailed to his iPhone. He then took his iPhone to an IT person at his law firm who put the clips onto a compact disc (CD), which he delivered to the Carbondale Police Department.

¶ 9    Schmidt averred that Whittington's apartment was right outside the office where one camera is located. Schmidt testified that, in the footage, defendant went down the hallway and touched the doorknob of Whittington's apartment. However, defendant just touched the doorknob and continued to walk further down the hallway. He then disappeared until roughly 20 minutes later when he walked out of Whittington's apartment. Schmidt verified that before he had his wife record the video footage on her iPhone, Schmidt viewed the entire footage and did not observe anything but an empty hallway during the period between the two recorded clips. Defendant never walked into Whittington's apartment during that time. Schmidt also testified that he did not alter the recording at all. Schmidt clarified that the two clips showed the time to be about 1:53 p.m. and 2:14 p.m., respectively. He testified that the CD admitted to the court fairly and accurately depicted what occurred on the cameras near Whittington's apartment.

¶ 10    On cross-examination, defense counsel asked if Schmidt could be considered a competent operator of the security system where he did not know how to export the footage. Schmidt responded that he could not download the footage to a flash drive but could operate the other functions of the system. He acknowledged that he had no formal training on the system. He read the instruction manual to try to see how to export a video but could not figure it out. Schmidt stated that he did not ask anyone from the police department or an IT person from his office to help him export the video. Schmidt also testified that no one from the police department attempted to retrieve and export the footage themselves. The footage would have been available from July 29, 2018, to July 31, 2018. Schmidt averred that while he observed the 20-minute period between the iPhone clips, he did not have any personal knowledge of what the cameras were recording.

¶ 11    Schmidt conceded that he could have recorded the entire original footage but did not because it would take too long. When asked if there were other people in the hallway, he averred that when defendant came out of Whittington's apartment, a woman appeared from the stairwell around the corner. Schmidt clarified that no one else was around or in front of Whittington's apartment that day except defendant and his wife, who were in front of the apartment earlier in the day.

¶ 12        Defense counsel argued that the iPhone clips violated the completeness doctrine and the best evidence rules (Ill. R. Evid. 1001-1004 (eff. Jan. 1, 2011)) and were unduly prejudicial. Counsel contended that the State was allowed to cherry-pick two parts of the full video and precluded the defense's fair shot to look at the whole original to decide if any portion would be beneficial to defendant. Counsel further argued that the police knew that the original would be deleted after 48 hours and had plenty of time—and the authority—to try to obtain the original. With respect to the best evidence rules, counsel claimed the iPhone clips were not originals or duplicates under the Illinois Rules of Evidence because they did not accurately reflect or reproduce the original's data. A comparable situation would be admitting "two or three words of a multiple page contract," which would also be objectionable. Counsel noted that while Illinois Rule of Evidence 1004 (eff. Jan. 1, 2011) allows other evidence of the contents of a recording if the original is lost or destroyed, the original here was destroyed with the knowledge of the State's witness and the failure of law enforcement to obtain the original in time. By allowing the State to pick two nonconsecutive clips, defendant was denied the chance to obtain any exculpatory evidence.

¶ 13        Defense counsel also objected to the iPhone clips for insufficient foundation under silent witness theory. He argued that Schmidt conceded he was incompetent to export the surveillance footage. Counsel also contended that there was insufficient chain of custody where Schmidt's wife was not present to testify to her part in transferring the recordings to Schmidt, and the IT person did not testify to how he burned the recordings from Schmidt's e-mail to a CD.

¶ 14        In response, the State relied on *People v. Taylor*, 2011 IL 110067, to argue that the iPhone clips were originals and therefore not subject to the best evidence rule. It contended that the clips—which copied the exact data from the surveillance hard drive as it played—is essentially that same as digital images transferred to a CD from a hard drive. See *id.* ¶ 43 (tape made by copying data stored on a hard drive of a DVR satisfies the definition of original). The State also argued that it did not cherry-pick evidence; rather, a neutral third party was in control of the copying process and determined what was relevant. As such, "[t]his really isn't a case of, you know, law enforcement attempting to frame something or attempting to alter evidence." As to the competency of the operator, the State claimed *Taylor* focuses on the competency to operate the recording device itself. Here, Schmidt provided sufficient testimony to how the surveillance system worked, that the system was operating properly, and what the cameras depicted. Schmidt also explained the entire copying process. The State argued that it need not present every link in the chain of custody when a witness testifies that its exhibit accurately displays what was originally recorded. Under such circumstances, any missing links go to the weight of the evidence, not the admissibility.

¶ 15        Based upon the arguments and Schmidt's testimony, the court determined that the iPhone clips were admissible. It stated, "in a perfect world, we would have clear and complete videos of every situation, clear and complete and clean chain of custody. Unfortunately, we do not work in a perfect world and cases do not arise and are not handled in a vacuum or in a perfect world." It further noted that defense counsel would have wide discretion on cross-examination.

¶ 16        At trial, Schmidt's testimony regarding the surveillance cameras and video was substantially the same as his testimony during direct examination and cross-examination at the pretrial hearing on defendant's motion *in limine*. Additionally, Schmidt testified that

Whittington informed him that his window had been damaged. Schmidt averred that no cameras faced Whittington's window from the exterior.

¶ 17     During the direct examination of Schmidt, the State played the two iPhone clips. The first clip depicted the man that Schmidt identified as defendant going up to the door that Schmidt identified as Whittington's apartment for a brief moment and then continuing down the hallway. The second clip, time-stamped roughly 20 minutes later, showed the same man exiting the door that he approached in the first clip while carrying a white bag.

¶ 18     The State next called Whittington to testify. Whittington testified that he had asked defendant and defendant's wife to clean his apartment for payment, about three times over the past two years, when he did not feel well enough to clean it himself. He averred that defendant, however, was not allowed in his apartment when he was not home. On the day of the incident, Whittington asked defendant to clean his apartment. Defendant started cleaning the apartment around 10 a.m. and left about 12:30 p.m. Afterwards, Whittington met a couple of friends at a local bar. He testified that he locked his door when he left, as he always has. The door was able to be locked from the inside or outside. Whittington averred that he was at the bar from about 1 p.m. to 6 p.m. and drank four to six beers.

¶ 19     Upon returning home, Whittington noticed that the doorknob was kind of bent, which made it difficult for him to unlock and open his door, which he found suspicious. Based on this suspicion, he checked his cup full of quarters that he kept on the stand for laundry and noticed all the quarters were missing. He also noticed that all the nickels and dimes were gone from a canister, in which he kept the rest of his coins. Whittington testified that he knew the coins were missing because he checked to see how many quarters he had before he left to go to the bar. He looked around further and realized that 40 or 50 tablets of his prescribed hydrocodone pain medication were also missing. Whittington then called his landlord and left a message that he believed someone broke into his apartment. He also called the police to make a report. Whittington testified that, at the time, he had no idea whom to pursue criminal charges against, so he just wanted to make a police report. He, however, informed the police that surveillance videotapes may be available because there were cameras in the building. Whittington admitted that he was "a little buzz[ed]" but was not drunk.

¶ 20     Over the next day or so, Whittington called the police again to inform that jewelry was also missing out of the top drawer of his chest and his window was broken. He testified that the missing jewelry was several pieces of turquoise jewelry, two of which were from his late mother. He knew the jewelry was in the drawer the day before the break-in because he saw it when he needed to check paperwork located in the same place. Whittington testified that he did not notice his window—located on the wall across from his front door—was pushed off the tracks at the bottom until his health care worker came over and raised the window to air the apartment out.

¶ 21     Whittington testified that he did not give people permission to come and go into his apartment as they pleased and did not allow anyone to come inside his apartment that afternoon. He also averred that he never found his missing jewelry.

¶ 22     On cross-examination, counsel impeached Whittington with a previous aggravated DUI conviction. Whittington agreed that he was not supposed to drink beer while taking hydrocodone, but occasionally did so. He testified that he took one hydrocodone pill before leaving for the bar that day. When asked if he believed drinking beer while taking hydrocodone affects his ability to recall details, he responded, "I don't take that many pills." Whittington

also did not believe that the beer and hydrocodone combination affected his ability to unlock his apartment.

¶ 23    Whittington acknowledged that he had known defendant for a couple of years, visited at defendant's apartment a couple times, and considered them to be on friendly terms. He conceded that he had previously accused defendant and defendant's wife of stealing from him but continued to let them clean his apartment after they denied doing so. Whittington also averred that, about a year prior, he allowed a homeless female friend to stay over for about a week. He stated that she took all her belongings when she left.

¶ 24    Whittington admitted that he had never opened his window before and always had his blinds shut, but that he did not believe it was broken because he "would have felt a breeze last winter." When asked about the police's actions on July 29, 2018, Whittington testified that the police did not take fingerprints, swabs for DNA, or foot impressions. He averred that the police told him they would contact the landlord and try to get the surveillance video.

¶ 25    The officer who was dispatched to Whittington's apartment around 7 p.m. on July 29, 2018, Michael McCrary, also testified. Officer McCrary stated that Whittington seemed "kind of confused" because somebody had been in his apartment and took his stuff. He did not believe Whittington was intoxicated. After speaking with Whittington, Officer McCrary inspected the door handle, which was bent such that it was causing a problem to open the door. Officer McCrary stated that, at that time, Whittington did not suspect anyone in particular and was not really interested in pursuing charges. So, Officer McCrary left his card and asked Whittington to contact him if Whittington found anything else.

¶ 26    The next day, Whittington called Officer McCrary to say that he noticed some jewelry was missing. At that time, because Whittington seemed interested in pursuing charges, Officer McCrary dusted for fingerprints on the drawer from which the jewelry was missing and surveyed Whittington's neighbors.

¶ 27    Officer McCrary testified that he contacted Schmidt on July 30, 2018, to inquire about the surveillance video, and Schmidt said he would make a copy of the video. The next day, on July 31, 2018, Schmidt informed Officer McCrary the copy was ready. After collecting and reviewing the surveillance video, Officer McCrary suspected defendant. He averred that he located defendant at his apartment and placed him under arrest for burglary. After a search incident to arrest, Officer McCrary discovered $3000 and approximately 20 hydrocodone pills in a prescription bottle in defendant's pockets.

¶ 28    On cross-examination, Officer McCrary acknowledged that the bottle of hydrocodone pills was prescribed to defendant. He also stated that if Whittington indicated an interest to press charges on July 29, 2018, he would have dusted for fingerprints on the doorknob and jars of coins at that time. For the same reason, Officer McCrary did not speak with the apartment's owner until July 30, 2018, despite knowing the apartment had cameras on July 29, 2018.

¶ 29    Officer Ashley Noto, who inspected Whittington's window, testified that Whittington's window "was off of its hinges or off its tracks" towards the bottom. Officer Noto stated that it had been tampered with and pushed in, and the screen was busted. She noted the window was about five feet from the ground with an air conditioner unit "sort of almost under, a little bit to the side of the window."

¶ 30    On cross-examination, Officer Noto testified that Whittington said he opens the window to let smoke out, and when he went to do so, he noticed the window was off its track. Officer

Noto conceded that, at that point, she was not sure whether the window had anything to do with the burglary. She stated that she did not take any fingerprints, DNA swabs, or shoe print impressions.

¶ 31　　For the defense, Tina Chappell, defendant's wife, testified. She averred that Whittington was friends with her and defendant and that they would hang out about five or six times a month. Chappell testified that she had cleaned Whittington's apartment a total of six or seven times, but defendant helped the last three times because her health made it more difficult. On more than one occasion, Whittington would let her into his apartment to clean while he went to the bar. Chappell stated that Whittington gave defendant permission to be in his apartment while she cleaned.

¶ 32　　Chappell testified that a homeless woman lived with Whittington about three months prior to the date of the alleged burglary. This lasted for a couple of months. Chappell stated the homeless woman would knock on his window for him to let her in, "or she may have come through the window," because you had to have a key to get in the apartment building. She also averred that about a month and half before defendant was arrested, Whittington had accused her of stealing a ring, but she informed him that she did not. About a month later, Whittington apologized to defendant and said he would apologize to Chappell for accusing her of stealing the ring because he later found the ring. When asked where he found it, Chappell replied, "It was in his apartment. Just probably like everything else is [*sic*] he's accusing [defendant] of stealing right now." She acknowledged she had a 2013 prior felony conviction for possession of controlled substance.

¶ 33　　The defense last called Alek Rose to testify. Rose stated that Whittington—while under the influence of alcohol—falsely accused him of breaking into Whittington's apartment a couple weeks before defendant was arrested. Rose testified that Whittington threatened if it happened again Whittington would kill him. Rose also averred that there was an empty apartment located a few inches away from Whittington's apartment door, which the owner of the apartment building allowed Rose to use as temporary storage.

¶ 34　　The State then recalled Schmidt as a rebuttal witness. He stated that he was certain the video depicted defendant standing in front of Whittington's apartment and not the empty apartment next door. He also was certain that the second video depicted defendant exiting Whittington's apartment, not the empty apartment. Schmidt stated that you could see defendant carrying something in his right hand as he exited Whittington's apartment. Schmidt averred that the empty apartment was always kept locked and that no tenant had permission to use it nor a key to open it.

¶ 35　　The State also recalled Whittington. He testified that after questioning defendant about a missing necklace, defendant and Chappell directed him to Rose, whom they saw jiggling his locks. Whittington admitted that, when he confronted Rose, he said "some things [he] probably shouldn't have." Whittington testified that he has not found any of the property that has been missing since July 29, 2018. He also clarified that the homeless woman, who had lived with him the year prior, never had a key to his apartment nor used his window to access his apartment. She would tap on his window so he knew she was there, and then he would let her in. The State played the second video, stopping it at the point where Schmidt testified you could see defendant exit the building and a woman coming from the stairwell. Whittington testified that the woman was not the homeless woman who lived with him. On cross-

examination, Whittington acknowledged that, on July 29, 2018, he watched TV as defendant and Chappell cleaned his apartment and did not pay much attention to what they were doing.

¶ 36    The jury found defendant guilty of residential burglary. On November 28, 2018, defendant filed a motion for a new trial and judgment notwithstanding the verdict, challenging, *inter alia*, the sufficiency of the evidence and the admission of the iPhone video clips. The court denied both motions, and the matter proceeded to a sentencing hearing.

¶ 37    At the sentencing hearing, the court first noted that it received and reviewed the presentence investigation (PSI) report. The PSI report revealed that defendant reported he suffered from kidney and bladder disease, arthritis, and bipolar disorder. However, no documentary evidence was obtained to verify these diagnoses. The report indicated that defendant has used illegal substances from the age of 13. He graduated high school. While defendant did not have stable full-time employment, he worked odd jobs for people at his church.

¶ 38    The PSI report also revealed that defendant had several previous convictions, including convictions in different states. Spanning over 1975 to 2013, defendant accumulated two larceny convictions, one petty larceny conviction, two possession of stolen property convictions, two retail theft convictions, two theft convictions, a burglary conviction, one unlawful possession of vehicle conviction, a breaking and entering conviction, one unauthorized use of a vehicle conviction, two escape from the Illinois Department of Corrections convictions, an assault of an officer conviction, and one unlawful possession of cannabis conviction. Based on his criminal history, the court noted that while defendant was convicted of a Class 1 felony, he must be sentenced as a Class X sentencing offender pursuant section 5-4.5-95(b) of the Unified Code of Corrections (730 ILCS 5/5-4.5-95(b) (West 2018)).

¶ 39    Defendant counsel called Eileen Troutt-Ervin to testify. Troutt-Ervin and defendant were members at the same church. She averred that she hired defendant to help around her house and that he was a hard worker. Although she was a little leery at first—because defendant was an ex-convict—she trusted him. She never felt something would be missing and never knew anyone at the church that felt like defendant would take something. She recently gave defendant a key to her shed, and defendant had access to her house without supervision. Troutt-Ervin also stated that defendant volunteered at the church.

¶ 40    The defense further admitted several character witnesses' letters from other members of defendant's church that shared the same sentiments as Troutt-Ervin's testimony. Collectively, they spoke to defendant's eagerness to work and willingness to volunteer for whatever needed done at the church. The letters also revealed that defendant worked for several members of the church, and no one felt anxious or suspicious letting him into their homes. Some letters stated that defendant had the freedom to enter the house as necessary to complete his work and that the church members trusted him. All the letters expressed great satisfaction for defendant's work. One letter also claimed that defendant suffered from the crime of being poor and the crime of being homeless.

¶ 41    The State argued that, before this incident, Whittington thought defendant was his friend and trusted him enough to invite him into his house, but defendant seized the opportunity to score from an easy target. While the medication and coins could be replaced, Whittington testified to the sentimental value of his jewelry that is irreplaceable. The State contended that this was a cold and calculated act perpetrated against a friend and neighbor. Defendant knew Whittington would be gone and took advantage, which reflects his true character. The State also noted defendant's criminal history, including multiple theft offenses, as an aggravating

factor (*id.* § 5-5-3.2(a)(3)). It also stated that defendant had shown no remorse or offered any type of apology to Whittington, that defendant had demonstrated that he is a deceitful and dishonest individual, and that "enough has to be enough." As such, the State contended that the sentence would be necessary to deter others from committing the same offense (*id.* § 5-5-3.2(a)(7)) and requested a 10-year sentence.

¶ 42    Defense counsel argued that while it respected the jury's verdict, the State's argument relating to remorse would ring truer if defendant was actually guilty of this crime. Defendant should not be required to admit guilt for something that did not happen and has a right to maintain his innocence. Defense counsel highlighted that defendant pled guilty in his prior cases and this was the first case to go to trial because defendant admits when he is actually guilty. Defense counsel also noted the mitigating factor that imprisonment would endanger defendant's health conditions of kidney and bladder disease (*id.* § 5-5-3.1(a)(12)). He argued that this factor should mitigate any consideration of a sentence that is longer than the minimum of six years because the Illinois Department of Corrections does not have a robust medical care system. Defense counsel also asserted the mitigation factors that defendant did not threaten or cause serious physical harm to another (*id.* § 5-5-3.1(a)(1), (2)). Accordingly, defense counsel requested the minimum of six years' imprisonment.

¶ 43    Defendant also made a statement. In addition to raising his health concerns and the fact that no one from his church distrusted him, defendant spoke of his rough life, with his mother being murdered and his father committing suicide by the time defendant was 14 years old. While he was in and out of prison all of his life, defendant averred that he always admitted when he was guilty. He stated, "But I cannot stay up here and take seven years or anything that the state is trying to offer me for something I did not do." After he married his wife, he did everything he could to keep them off the streets.

¶ 44    Defendant also questioned the State's evidence, claiming he could not climb up a building at 65 years old. He also posed the question, "If I went into the window, why didn't I come out of the window?" Defendant contended the trash bag that he carried out of Whittington's apartment was filled with beer cans and toilet paper rolls because Whittington was a slob. Defendant further questioned Whittington's credibility, claiming he was a drunk and pill head. Defendant noted Whittington's previous criminal activity and asserted that Whittington falsely reported this incident so that he had an appropriate reason to get his pain medication refilled. He expressed his frustration with the criminal justice system, stating that he had no reason to steal Whittington's jewelry because people at his church gave him watches, rings, and necklaces as gifts.

¶ 45    The trial court stated that it considered all the evidence before it, including the character letters, Troutt-Ervin's testimony, and the PSI report. It also considered all the factors in mitigation and aggravation. In addition to those factors argued by the parties, the court further noted—to an extent—the character and attitude of defendant, indicating he is unlikely to commit another crime, and asked whether imprisonment would entail excessive hardship on his wife (*id.* § 5-5-3.1(a)(9), (11)). The court understood defendant's position in maintaining his innocence, stating, "You've made a lot of progress during your time period since you were last incarcerated." It, however, also averred that it was bound to some mandatory duties. Considering all the above, the court sentenced defendant to 6½ years' imprisonment.

¶ 46                                    II. ANALYSIS

¶ 47    On appeal, defendant challenges the admission of the iPhone clips, the sufficiency of the evidence, and his sentence.[1] We address each in turn.

¶ 48                              A. Admission of iPhone Clips

¶ 49    Defendant argues that the iPhone clips violate the best evidence rule, which requires production of the original to prove the content of a recording. *Electric Supply Corp. v. Osher*, 105 Ill. App. 3d 46, 48 (1982).[2] Although defendant concedes that Illinois Rule of Evidence 1003 (eff. Jan. 1, 2011) allows duplicates to be admitted to the same extent as originals, he contends that the iPhone clips are not duplicates because they are not accurate reproductions of the original surveillance footage. According to defendant, the original was therefore required. Citing *Osher*, 105 Ill. App. 3d at 49, defendant explains that if the original is not being introduced, the offering party can introduce evidence to prove the contents of an original where it is able to prove (1) the prior existence of the original, (2) the original is currently unavailable, (3) the authenticity of the substitute, and (4) the proponent's diligence in attempting to procure the original. Defendant asserts that the State failed to prove the fourth requirement where the police knew that the surveillance footage existed from the commencement of the investigation but failed to practice due diligence in obtaining it. Instead, it relied on a lay person who was incompetent to accurately copy the footage.

¶ 50    The State contends that the iPhone clips were properly admitted because it laid a proper foundation under *Taylor*, 2011 IL 110067. It argues that there is nothing to cast doubt on the capability of the system for recording or reliability. Schmidt testified that he was familiar with the system and explained how the system worked. Schmidt further testified that the video surveillance system was functioning properly and that the iPhone clips were a fair and accurate depiction of what occurred in front of the cameras. While Schmidt was not capable of exporting the videos directly from the system, he explained the copying process and that he—a noninterested third party—copied what he believed to be relevant. Schmidt assured that nothing occurred in the video during the elapsed time between the two iPhone clips. The State notes that *Taylor* held "given the particular circumstances of any case, alterations, deletions, or editing may be necessary." *Id.* ¶ 44. It thus argues that, given the totality of the circumstances presented in this case, the admission of the video was not an abuse of discretion.

¶ 51    The parties misapprehend the relevant principles here. In *Taylor*, the supreme court clearly addressed the issue of whether the State laid a proper foundation under the "silent witness theory" for the admission of a surveillance videotape. *Id.* ¶ 1. In doing so, the court noted that the videotape in *Taylor* was an original as defined by Rule 1001(3). *Id.* ¶¶ 42-43. The best evidence rule and a potential duplicate copy was not at issue.

---

[1]Defendant's opening brief on appeal also argued that the trial court erred in allowing the jury, during their deliberations, to view the iPhone clips in the court room with the parties present. However, in his reply brief, defendant concedes the court did not err in this respect based on the Illinois Supreme Court decision in *People v. Hollahan*, 2020 IL 125091—which was published after defendant filed his opening brief. Accordingly, we do not address this issue.

[2]We note that although defendant also argued the iPhone clips violated the completeness doctrine and lacked a proper foundation at trial, he fails to assert those arguments on appeal. We therefore address only whether the iPhone clips violated the best evidence rule.

¶ 52    If defendant had challenged the foundation of the iPhone clips on appeal, I agree with my colleagues that *Taylor* would be instructive. However, as apparent from his appellate briefs, defendant declined to present any argument regarding the foundational requirements in *Taylor* or that the clips should have been excluded based on a lack of foundation. Admittedly, the State argued that the iPhone clips were admissible under *Taylor*'s foundation requirements and that Illinois Supreme Court Rule 341(j) (eff. Oct. 1, 2020) confines an appellant's reply brief to the arguments presented in the appellee's brief. Yet, instead of disagreeing with the State's application of *Taylor* to the facts here, defendant's reply brief specially noted that "the foundation for the video is entirely beside the point" of his argument. The only issue on appeal concerning the iPhone clips is whether their admission violated the best evidence rule. *Taylor* therefore does not guide our analysis. *People v. Johnson*, 2021 IL App (5th) 190515, ¶ 29 (if a party fails to raise an argument on appeal, it is forfeited). Nonetheless, I note that I agree with the special concurrence's analysis of *Taylor* to the facts of this case.

¶ 53    Defendant also mistakenly relies on *Osher*. In that case, the First District addressed whether the admission of unexecuted copies of the trust receipt and wavier of lien violated the best evidence rule. *Osher*, 105 Ill. App. 3d at 49. The court stated that where the original is shown to be unavailable, "the proponent must prove the prior existence of the original, its unavailability, the authenticity of the substitute and the proponent's own diligence in attempting to procure the original." *Id.* at 48-49. Because the plaintiff failed to show the original was unavailable and made no attempt to recover the original from the third party, the trial court erred in admitting the unexecuted copies. *Id.* at 49. While *Osher* analyzed a best evidence issue under the proper legal principles for that time, in 2010, Illinois adopted several rules concerning the use of an original, duplicate, and other means to prove documentary evidence. Ill. R. Evid. 1001 (eff. Jan. 1, 2011) (defining what constitutes an original and duplicate); Ill. R. Evid. 1002 (eff. Jan. 1, 2011) (explaining the requirement of an original to prove the content of a writing, recording, or photograph); Ill. R. Evid. 1003 (eff. Jan. 1, 2011) (explaining the admissibility of duplicates); Ill. R. Evid. 1004 (eff. Jan. 1, 2011) (explaining when other evidence of the contents of a writing, recording, or photograph may be admissible). Accordingly, Illinois Rules of Evidence comprise the proper guiding principles for this issue.

¶ 54    The decision to admit evidence lies within the sound discretion of the trial court and will not be reversed unless that discretion was clearly abused. *People v. Jaynes*, 2014 IL App (5th) 120048, ¶ 51. Although our evidentiary rules still require an original to prove the content of a writing, recording, or photograph, there are now exceptions. Ill. R. Evid. 1002 (eff. Jan. 1, 2011). Since 2011, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Ill. R. Evid. 1003 (eff. Jan. 1, 2011). A duplicate is defined as "a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography *** by mechanical or electronic re-recording, or *** by other equivalent techniques which accurately reproduces the original." Ill. R. Evid. 1001(4) (eff. Jan. 1, 2011). Our rules also now provide that other evidence may be admissible to prove the contents of a writing, recording, or photograph if "[a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." Ill. R. Evid. 1004(1) (eff. Jan. 1, 2011). Notably, these rules differ from defendant's authority in that proponents need not prove their diligence in obtaining the original before destruction to admit a duplicate or other evidence of the contents of a recording. Ill. R. Evid. 1004(1), Committee

Comments (adopted Sept. 27, 2010) (it is "no longer necessary to show that reasonable efforts were employed beyond available judicial process or procedure to obtain an original possessed by a third party"); see *United States v. McGaughey*, 977 F.2d 1067, 1071 (7th Cir. 1992) (diligent search for original is only relevant as "an avenue by which the larger issue of the document's destruction may be proved").

¶ 55    Even taking as true defendant's argument that the iPhone clips are not duplicates under Rule 1001(4), the clips—along with Schmidt's testimony—were admissible as other evidence to prove the contents of the recording unless the State lost or destroyed the original surveillance video in bad faith. Ill. R. Evid. 1004(1) (eff. Jan. 1, 2011). We note that there is no controlling precedent to guide us in determining whether the police's actions in this case amount to bad faith under Rule 1004(1). In such circumstances, it is reasonable to look to federal cases interpreting and applying the practically identical Rule 1004 of the Federal Rules of Evidence (Fed. R. Evid. 1004). *Diamond Mortgage Corp. of Illinois v. Armstrong*, 176 Ill. App. 3d 64, 71 (1988); see *Leow v. A&B Freight Line, Inc.*, 175 Ill. 2d 176, 185 (1997).

¶ 56    We find *United States v. Maxwell*, 383 F.2d 437 (2d Cir. 1967), is factually similar to this case. In *Maxwell*, a customs agent dictated roughly 10 minutes of a 45-minute conversation between the defendants to a shorthand stenographer, whose notes were then typed. *Id.* at 442. The deleted portions "were either irrelevant, inaudible or repetitive." *Id.* The agent subsequently determined that the transcript was accurate, based on his comparison of the transcript with the recording. *Id.* at 441-42. After a mistrial, the agent believed defendant would not be retried, so he returned the recordings to circulation where they were erased. *Id.* at 443. During retrial, the transcript was admitted into evidence. *Id.* at 442.

¶ 57    On appeal, defendants claimed that the admission of the transcript violated their rights under the due process clause of the fifth amendment because the accuracy of the transcript and whether it honestly reflects the whole conversation could not be ascertained. *Id.* at 441-42. The Second Circuit found the defendant's argument presented a best evidence question. *Id.* at 442. It then found the transcript was admissible as secondary evidence where the agent testified that it accurately represented the recordings. *Id.* The court explained that while it did not approve of the government's conduct in not handling the recordings more carefully while the charges against defendant were outstanding, there was evidence to show that the recordings were not erased to prevent their production for trial. *Id.* It was therefore within the trial court's discretion to admit the transcript. *Id.* at 443.

¶ 58    In *United States v. Ross*, 33 F.3d 1507, 1513-14, 1513 n.5 (11th Cir. 1994), the admission of transcripts made by the Spanish National Police of tape-recorded conversations involving defendant was affirmed because the recordings were lost or destroyed through no fault of the United States government, even where the transcripts included only the important or interesting portions of the conversations. The Eleventh Circuit reasoned that the prosecution never had control of the tapes, the Spanish officers who initially transcribed the recordings were cross-examined by defense counsel, and defense counsel "had ample opportunity to attack the transcripts' credibility before the jury." *Id.* at 1514. Similarly, in *United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996), the Ninth Circuit found that a transcript of a videotaped deposition was admissible under Federal Rule of Evidence 1004(1) where the destruction of the videotape was "done in the ordinary course of business and not at the behest of the government."

¶ 59      Indeed, the federal case law finds that other evidence to prove the contents of a writing, recording, or photograph is admissible "except where the unavailability [of the original] is caused by the proponent's purposeful design to prevent production of the [original] evidence." *Maxwell*, 383 F.2d at 443 n.3. The cases also demonstrate that other evidence is not unfair or inadmissible simply because there are deletions from the original and that the accuracy of the other evidence may be established by the testimony of witnesses who reviewed the original. *Id.* at 442; *Ross*, 33 F.3d at 1514.

¶ 60      Here, no evidence suggests that the police purposefully designed the prevention of the original surveillance video or delayed sending its own IT people to download the surveillance footage to avoid the original surveillance from being admitted at trial. Schmidt informed police that he would transfer the surveillance video onto a CD and a day later stated that it was ready. Nothing in the record indicates that the police directed Schmidt to transfer the video or that police knew Schmidt would be incapable of transferring the video in its entirety. Defendant concedes that it is not clear from the record whether police had time to download the surveillance footage in its entirety after it knew that Schmidt rerecorded only the portions he found relevant. The police therefore did not lose or destroy the original footage in bad faith and met the conditions of Rule 1004(1).

¶ 61      We further reject the contention that the admission of the iPhone clips was an error based on inaccuracy or unfairness. At trial, the State verified the accuracy of the iPhone clips through the testimony of Schmidt, who explained that he could not transfer the original footage from the surveillance system to a CD. He testified that he did not copy the entirety of the original footage on his wife's iPhone because it would take too long and certain portions of the footage were irrelevant. He also clarified that there were no other people near Whittington's door at any time nor anyone in the hallway during the missing period between the iPhone clips. Defense counsel cross-examined Schmidt regarding the iPhone clips and original footage twice and declined a third opportunity.

¶ 62      Defendant implies that this court should not take as true Schmidt's testimony or Whittington's testimony that defendant completed his authorized cleaning duties earlier that day as true, but these credibility determinations are better suited for the trier of fact. *People v. Jackson*, 2020 IL 124112, ¶ 69. While we would have preferred the State to ensure the original footage was memorialized in its entirety, we cannot find the trial court abused its discretion in admitting the iPhone clips based on this record.

¶ 63                              B. Sufficiency of the Evidence

¶ 64      Defendant also challenges the sufficiency of the State's evidence. To prove the offense of residential burglary, the State must prove that defendant knowingly and without authority entered or remained within the dwelling place of another with the intent to commit a felony or theft therein. 720 ILCS 5/19-3(a) (West 2018). Defendant argues that the State failed to prove that he entered Whittington's apartment without authority and with the intent to commit a theft.

¶ 65      Specifically, defendant highlights that no evidence demonstrated that he reentered the apartment, no stolen property was recovered, and no forensic evidence or eyewitness tied defendant to this offense. Defendant also claims that nothing at trial established that Whittington actually checked for the items that were allegedly stolen before he left that day nor when he last checked the window. As such, Whittington's broken window could have occurred at any time—especially where the defense put on evidence that a homeless woman

- 13 -

was living with Whittington, she may have entered routinely through the window, and the allegedly stolen items could have been missing before that day. Moreover, defendant asserts that Whittington's testimony is unreliable and circumstantial because he was admittedly intoxicated on that day and had a history of falsely accusing others of stealing. Therefore, according to defendant, Whittington's timeline of the events is called into question. He further contends that, even assuming defendant did steal from Whittington, defendant could have done so when he was permissively in Whittington's apartment earlier with the intent to clean.

¶ 66    It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. McLaurin*, 2020 IL 124563, ¶ 22. When reviewing the sufficiency of the evidence in a criminal case, it is not the reviewing court's function to retry the defendant, nor should it substitute its own judgment for that of the trier of fact. *People v. Swenson*, 2020 IL 124688, ¶ 35. Instead, the reviewing court determines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard, circumstantial evidence can be sufficient to sustain a conviction. *Jackson*, 2020 IL 124112, ¶ 64. The intent to commit a theft can be inferred from the surrounding circumstances, including "the time, place, and manner of entry into the premises; the defendant's activity within the premises; and any alternative explanations offered for his presence." *People v. Maggette*, 195 Ill. 2d 336, 354 (2001). "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Jackson*, 2020 IL 124112, ¶ 64. We draw all reasonable inferences in favor of the State. *People v. VanHoose*, 2020 IL App (5th) 170247, ¶ 25.

¶ 67    At trial, the State presented iPhone clips that showed defendant touching the doorknob of Whittington's apartment soon before Whittington discovered it was bent. The iPhone clips, along with testimony at trial, showed defendant exited Whittington's apartment without defendant entering through the front door and during Whittington's absence. That same day, Whittington discovered that his coins and pain medication were missing. A day later, Whittington also discovered that several pieces of jewelry were missing and that his window was broken, as if someone had tampered with it.

¶ 68    While no direct evidence tied defendant to this crime, the circumstantial evidence that defendant inexplicably accessed Whittington's apartment—while Whittington was absent— and left Whittington's apartment with unknown items can be sufficient to prove residential burglary where Whittington testified that defendant did not have permission to enter his home without Whittington's presence. See *People v. Toolate*, 101 Ill. 2d 301, 308 (1984) ("[P]roof of unlawful breaking and entering is sufficient to infer to commit theft."); *People v. Fico*, 131 Ill. App. 3d 770, 772 (1985) (same). Even taking defendant's assertion that the window was broken prior to the day of the incident as true, a jury could reasonably infer that defendant used the window to access the apartment where the evidence demonstrated that defendant never entered through the front door.

¶ 69    Moreover, despite defendant's contentions, Whittington testified to his observation that the missing coins were present in his home before leaving around 1 p.m. that day and recently observed the presence of his jewelry a few days prior. It can also be reasonably inferred that Whittington knew roughly how many prescribed pills were in his medication bottle when he

- 14 -

testified that he recently had the prescription for 120 pills refilled and took one pill before leaving that day. While defendant, on appeal, provided a possible explanation that he could have taken the items while in Whittington's apartment with authority to clean, the jury is not required to search for any possible innocent explanation and " 'elevate [it] to the status of *** reasonable doubt.' " *People v. Castile*, 34 Ill. App. 3d 220, 225 (1975) (quoting *People v. Goodwin*, 24 Ill. App. 3d 1090, 1094 (1975)).

¶ 70    Defendant also requests reversal on the basis that Whittington was not credible. Defense counsel presented the same contentions of incredibility at trial as defendant raises on appeal. Indeed, the contentions call Whittington's credibility into question. However, "[a] conviction will not be reversed simply because *** the defendant claims that a witness was not credible." *People v. Gray*, 2017 IL 120958, ¶ 36. It is in the purview of the fact finder to resolve questions of credibility. *Jackson*, 2020 IL 124112, ¶ 69. Moreover, the fact that a witness was under the influence of alcohol goes to the weight, not the admissibility, of his or her testimony. *Gray*, 2017 IL 120958, ¶¶ 40-41. Accordingly, we do not find that no reasonable juror could have found all the essential elements of residential burglary beyond a reasonable doubt.

¶ 71                                    C. Excessive Sentence

¶ 72    Lastly, defendant contends that his sentence is excessive based on several mitigating factors. He further relies on the facts that his conviction was based on very thin evidence and involved a theft of minimal items. While defendant concedes that he failed to file a postsentencing motion to preserve this issue, he urges this court to apply plain error, which may be invoked if "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Nevertheless, to obtain relief, defendant must first demonstrate that a clear error occurred. *Id.* We find defendant has not established that an error occurred in this case.

¶ 73    In determining the sentence, the trial judge must consider all relevant factors in mitigation and aggravation and "balance the retributive and rehabilitative purposes of the punishment." (Internal quotation marks omitted.) *People v. Weiser*, 2013 IL App (5th) 120055, ¶¶ 31-32. The trial judge is afforded substantial deference in sentencing because—unlike a reviewing court—it has an opportunity to weigh such factors as "defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. The defendant's potential for rehabilitation, however, is not entitled to more weight than the aggravating factors. *Weiser*, 2013 IL App (5th) 120055, ¶ 32. A reviewing court cannot reweigh the aggravating and mitigating factors in reviewing a sentence, nor can it "substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Absent an abuse of discretion, a trial court's sentence will not be altered on review. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26. A sentence that falls within the statutory limits is presumed proper. *Id.* ¶ 28. The presumption is rebutted only where a defendant demonstrates that the sentence imposed "greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Id.*

¶ 74    From the outset, we note that defendant could have been sentenced to 30 years' imprisonment (730 ILCS 5/5-4.5-25(a) (West 2018)), but the court imposed a sentence that was six months over the minimum. Defendant contends it was an abuse of discretion to impose

- 15 -

any more time than the statutory minimum of six years because the letters from his church members demonstrate that he had been restored to useful citizenship. While defendant's character letters presented mitigating evidence, the State also presented aggravating factors of a lengthy criminal history—most of which involved theft—and the necessity to deter others from this crime.

¶ 75 Defendant's arguments would require this court to reweigh the relevant factors, which we cannot do. It is the duty of the trial court to balance the mitigating and aggravating factors in imposing an appropriate sentence. *Etherton*, 2017 IL App (5th) 140427, ¶ 34. The record makes clear that, in determining 6½ years' imprisonment was the appropriate sentence, the court considered all the factors in mitigation and aggravation. It was not required to attribute more weight to defendant's rehabilitative potential than to the aggravating factors. *Weiser*, 2013 IL App (5th) 120055, ¶ 32.

¶ 76 We also cannot say that the imposition of six months over the minimum was a great variance from the purpose of the law or manifestly disproportionate to the offense merely because defendant perceived the stolen items as insignificant. Defendant has not provided any authority to the contrary. Accordingly, we find the court did not abuse its discretion in imposing a term of 6½ years' imprisonment.

¶ 77                                                III. CONCLUSION

¶ 78 Because the destruction of the original surveillance video was not by the State's purposeful design, the trial court did not err in admitting two nonconsecutive iPhone clips of the surveillance footage where a witness testified to their accuracy compared to the original surveillance footage. Consequently, the State presented sufficient circumstantial evidence to prove that defendant committed residential burglary beyond a reasonable doubt. The trial court also did not abuse its discretion in sentencing defendant to 6½ years' imprisonment. Accordingly, we affirm defendant's conviction and sentence.

¶ 79 Affirmed.

¶ 80 JUSTICE WHARTON, specially concurring:

¶ 81 While I agree with the majority's opinion that the trial court did not err in admitting the iPhone clips of the surveillance video, I would reach this conclusion on different grounds. First, I find that the defendant did not forfeit his right to argue the applicability of *Taylor*. I also conclude that *Taylor* is relevant and applicable to an analysis of the admission of the clips into evidence. Finally, I find that *Taylor* and other relevant factors support the admission of the video clips.

¶ 82 The dissent analyzes and concludes that the defendant did not forfeit a *Taylor* analysis simply because he did not include the issue in his initial brief on appeal. I agree. Illinois Supreme Court Rule 341(j) (eff. Oct. 1, 2020) provides that an appellant's reply brief must be responsive to arguments present in the appellee's brief. Therefore, I agree with the dissent that *Taylor* should be analyzed.

¶ 83 Initially I consider the applicable standard of review on this evidentiary issue. The trial court has substantial discretion in determining whether evidence is admissible. *People v. Willigman*, 2021 IL App (2d) 200188, ¶ 43 (citing *People v. Becker*, 239 Ill. 2d 215, 234

(2010)). On appeal, the reviewing court should not reverse a trial court's discretionary admission of evidence unless the court abused its discretion. *Id.* "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court." *Id.*

¶ 84 Although the supreme court in *Taylor* relied upon six factors in its determination that videotapes could be introduced as substantive evidence under the "silent witness" theory, those six factors are not exclusive. *Taylor*, 2011 IL 110067, ¶ 35. The six factors utilized by the court in *Taylor*, argued by the State in this case, and analyzed by the dissent are as follows:

"(1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6) explanation of any copying or duplication process." *Id.*

¶ 85 Based on the following analysis, I conclude that the totality of the evidence presented in this case supports the admissibility of the video clips as substantive evidence. I find persuasive the State's arguments regarding the relevancy in this case of the six factors utilized by the *Taylor* court. I also find that there are additional factors that merit consideration based upon the unique facts of the instant case. I will briefly examine the six *Taylor* factors and additional factors.

¶ 86 A. Capability of the Device for Recording and General Reliability

¶ 87 In this case, the recording system was clearly capable of recording. The owner of the building, Schmidt, testified to his purchase and installation of the system, as well as the ability to review the recordings from a mobile phone. The system consisted of four cameras hardwired to a digital video recording device. The four cameras automatically recorded. The recordings were date and time stamped and incapable of being edited. The recordings were automatically saved for 48 hours and then deleted.

¶ 88 B. Competency of the Operator

¶ 89 I also find that considering the totality of Schmidt's testimony, he was a competent operator. Schmidt was successful in setting up the surveillance system. He was also successful in locating the precise date and time of the suspected crime. He testified that to the best of his knowledge, the clips reflected a fair and accurate depiction of what was in front of the cameras. Although Schmidt lacked expertise in exporting the video clips, his testimony adequately established his general competence with the system and in providing a copy of the clips to law enforcement.

¶ 90 C. Proper Operation of the Device

¶ 91 Based upon Schmidt's testimony, I find that there is no question that the system operated properly.

¶ 92 D. Chain of Custody

¶ 93 In this case, the chain of custody evidence presented was sufficient given this unique factual setting. Schmidt was an independent witness and not a member of law enforcement. He testified that he reviewed the recorded footage on the primary system and was present when

- 17 -

his wife recorded the two clips on her iPhone. Schmidt testified to the process his wife used to record the clips and forward them to his business e-mail. Schmidt testified about how he retrieved the clips from his e-mail, how the clips were transferred onto a CD by an employee, and how he delivered the CD to law enforcement. To the extent that this chain of custody is lacking in some capacity, "gaps in the chain of custody go to the weight of the evidence, not its admissibility." *Id.* ¶ 41.

¶ 94                    E. Explanation of the Process of Any Copying or Duplication

¶ 95        Turning to the explanation of the copying process, I note that Schmidt was a noninterested party. He was the owner of the building and had access to the recordings created from the surveillance cameras he installed. He reviewed the recordings, found only two relevant clips, copied the clips to the best of his ability, and then provided the clips to law enforcement. At trial, he acknowledged his technological limitations in copying the clips. However, while his technological limitations required him to copy the footage in an indirect manner, the process utilized did not result in an inaccurate copy. I find that this case differs from *Taylor* in that the copy of the video in *Taylor* was made by law enforcement and not by a private individual. Moreover, even though the State did not explain its copying process in *Taylor*, the supreme court concluded that the police report summary—stating that a copy of the relevant video surveillance was copied from the hard drive onto a VHS tape—provided a proper explanation of the copying process because this "evidence" addressed the preliminary question of admissibility. *Id.* ¶ 40 (preliminary questions, such as the admissibility of evidence, are "not constrained by the usual rules of evidence" (citing Ralph Ruebner, Illinois Criminal Trial Evidence 3 (4th ed. 2001), and 11 Ill. Prac., Courtroom Handbook on Illinois Evidence § 104.1 (2001))).

¶ 96                                   F. Additional Factors

¶ 97        I also find that Schmidt's familiarity with the location of the cameras and what the camera recordings depicted, as well as the location of the defendant's apartment, supports the admissibility of the iPhone video clips. See *id.* ¶ 35 (stating that "additional factors may need to be considered"). Schmidt was the owner of the building at issue. He was also familiar with the victim and the defendant. Schmidt identified the defendant, the defendant's location in the building, the defendant's proximity to the victim's apartment based upon his past interactions with the defendant and the victim, the location of the cameras, and the footage obtained. I find that Schmidt's personal knowledge enhanced his testimony about the accuracy and reliability of the video recordation and review process.

¶ 98        In addition, I find that the lack of bad faith by the local police department relative to the video recording is an additional relevant factor supporting admission of the video clips. *Id.* As noted by the majority, Schmidt notified the police that he would transfer the video on to a CD. No evidence suggests that the police asked Schmidt to create a copy. Additionally, there is no indication that the police knew that Schmidt was only going to transfer clips and not the entirety of the surveillance video. The evidence also fails to support a conclusion that the police purposefully prevented the preservation of the entire surveillance video. Initially, the victim did not want to pursue a criminal case. With no victim to pursue the case, coupled with the building owner's offer to provide a copy of the original surveillance video, I believe those facts

provide a context for the police department's decision not to collect the complete surveillance video.

¶ 99    In reviewing this issue, I am reminded that the ultimate issue, regardless of the number of relevant factors considered, "is the accuracy and reliability of the process that produced the recording." *Id.* The defendant does not dispute that he is depicted in these two clips. However, the defendant objected to the fact that the clips were excised from the much longer surveillance video. The supreme court addressed this concern in *Taylor*, noting that editing would not necessarily result in the evidence being inadmissible. *Id.* ¶ 44. The editing would go to the weight accorded the evidence. *Id.* (citing 16 Am. Jur. *Proof of Facts* 3d § 17 (1992) and 44 Am. Jur. *Trials* § 31 (1992)). The party offering the video as evidence should remove irrelevant or unimportant material from the video. *Id.* "The more important criteria is that the edits cannot affect the reliability or trustworthiness of the recording. In other words, the edits cannot show that the recording was tampered with or fabricated." *Id.* In this case, Schmidt "edited" the recordings by omitting the irrelevant portions and limiting the clips to the two appearances of the defendant. Schmidt's court testimony established that the recorded clips shown in court were part of the complete recording that he and his wife reviewed. Thus, I would find that there was no evidence that the video clips had been fabricated or otherwise altered in some manner that would render the clips inadmissible.

¶ 100    Additionally, I conclude that admission of the video clips was supported by Illinois Rule of Evidence 1003 (eff. Jan. 1, 2011). As noted by the majority, Rule 1003 provides that a duplicate is admissible as an original unless there is a genuine question as to the authenticity of the original or if the admission of the duplicate under the circumstances would be unfair. *Id.* Here, testimony of the building owner established that there was no issue of the authenticity of the original recording. Moreover, I find that admission of the duplicate under this case's unique facts was not unfair. The video clips were captured by an uninterested party, and there was adequate testimony of the process followed by the owner of the building and its recording system. In addition, the defendant did not dispute that his image was captured by the recording system.

¶ 101    Overall, I find that the totality of the evidence presented in this case supports the admissibility of the video clips. I concur with the result reached in the majority's opinion and, if *Taylor* is inapplicable through the defendant forfeiting his foundational argument, I further concur with the majority's analysis of the best evidence rule. I also concur with the majority's conclusion that the State proved the defendant's guilt of residential burglary beyond a reasonable doubt and that the defendant's 6½-year prison sentence was not excessive.

¶ 102    JUSTICE CATES, dissenting:

¶ 103    The State's case rises and falls on the admissibility of two short clips made from a surveillance video. Other than the lens of a camera, there were no eyewitnesses to this residential burglary. There were no fingerprints or other types of forensic evidence for the jury to consider. None of the items allegedly reported stolen were recovered or even connected to the defendant. Thus, the authenticity and reliability of the video clips at issue were key to the State's case. In fact, as demonstrated by the record, these videos clips were of such significance that the jury requested the opportunity to view them again during their deliberations. Inasmuch as the original surveillance video was not preserved, and the owner of that system did not appreciate how to operate his own equipment, such that the chain of custody for the creation

of these video clips was not clear, it is my view that the trial court abused its discretion in allowing these clips to be viewed by the jury as substantive evidence. Therefore, I must respectfully dissent.

¶ 104     On August 1, 2018, the defendant was charged with a residential burglary that occurred on July 29, 2018, at the home of Michael Whittington. On October 29, 2018, the first day of trial, defense counsel filed a motion *in limine* to preclude the introduction at trial of two short iPhone video clips that were captured by the wife of Pieter Schmidt, the owner of the apartment complex where Whittington lived. In the written motion and in arguments before the trial court, the defendant claimed that the video clips were unduly prejudicial in that the complete surveillance video recording had not been preserved by law enforcement and made available to the defense. The defendant also claimed that the two video clips—each 20 to 30 seconds long—were segments from a longer, now nonexistent, video recording and that there was no way to determine how or why these particular clips were extracted from the complete video surveillance footage. The defendant explained that the video clips were actually videos of a video, in that the clips were made using the iPhone camera of Schmidt's wife to capture the images as the surveillance video recording was played on a DVR, and that each video clip included a date and time stamp. Because the original video was not preserved, the defense had no way to determine what occurred before, after, and between those two clips and whether the video clips were fair and accurate representations of the images recorded in the original video.

¶ 105     Relying upon Rules 1001-1003 of the Illinois Rules of Evidence, the defendant also argued that the video clips violated the best evidence rule, as the original recording was not produced. He claimed that the video clips were not duplicates of the original and that the 20- to 30-second clips did not "accurately reproduce the original," as defined in Rule 1001(4) (Ill. R. Evid. 1001(4) (eff. Jan. 1, 2011)), "because they are not the whole data on the original."

¶ 106     On the second day of trial, the State made an offer of proof in response to the defendant's motion *in limine*. The State called Pieter Schmidt to authenticate the video clips. Schmidt owned the apartment complex where both the defendant and Whittington lived. The apartment complex was equipped with a video surveillance system. Schmidt and his wife had recently purchased the surveillance system, and they, with the assistance of their maintenance man, installed it at the apartment complex. Schmidt testified he was familiar with the surveillance system to the extent that he could access it through his cellphone. He had not been trained on the use of this system and described his familiarity as "learn as you go." Schmidt stated that he had never had the occasion to retrieve a video from the surveillance system prior to this occasion.

¶ 107     Schmidt testified that the system consisted of four cameras that were "hardwired to a DVR." Two of the cameras were located outside of the building. Another was located in the office, directed through the office windows and into the hallway, and the fourth camera was pointed down the hallway. The cameras recorded "whatever passe[d] in front of them." Schmidt believed that the recorded activities were saved on the DVR for a period of 48 hours. He indicated that the video recordings contained a date and time stamp, and he explained that if he wanted to view a specific recording, he could input the date and time, and the video would play. The person viewing the video recording could not alter or edit it.

¶ 108     Schmidt testified that the video surveillance equipment was operating properly on July 29, 2018, the date of the burglary. He knew the equipment was functioning properly on that date because he was "able to review the videotape and see images on it and see the date and the

- 20 -

time." Schmidt recalled that he and his wife viewed the video from that date after receiving a phone message from a tenant. The tenant reported that he had been "robbed" and that the police "were interested in knowing if the video surveillance system worked." The tenant indicated that a police officer had left his card for Schmidt.

¶ 109     Schmidt testified that he tried to download the video footage from the surveillance system but was unable to do so. "We, I attempted to put it onto a flash drive, but I'm not competent enough apparently to do that. And we tried and could not get it to download on a flash drive. So we recorded it on a cellphone. Basically, I think they call that a screenshot." Schmidt stated that his wife recorded the video on her iPhone. She then "transferred it to my iPhone, and then I took it to my office where I had put it on a compact disc, which I then delivered to the Carbondale Police Department." When asked if he recorded the complete video footage from 1:53 p.m. to 2:14 p.m. on that date, Schmidt replied, "No, we did not." Schmidt explained, "We would have had to stand there for 20 some minutes, 25 minutes holding a cellphone recording, so we recorded just a couple of clips that we thought were important." In response to further questioning about what was occurring on the video from 1:53 p.m. to 2:14 p.m., Schmidt stated that "the hallway was empty for quite a period of time."

¶ 110     Schmidt testified that he reviewed the content of the compact disc prior to the day of trial. He stated that the disc contained the same two video clips that he and his wife copied from the video surveillance system and that the video clips fairly and accurately depicted what he saw on the surveillance video the day he viewed it. After presenting this testimony, the State offered a copy of the compact disc as People's exhibit No. 1.

¶ 111     During cross-examination, Schmidt acknowledged that he had never been formally trained on the video surveillance system. He stated that the system had an instruction manual and that he had read parts of it. When asked if he read the manual in an effort to export the entire video footage to a flash drive, Schmidt replied, "Yeah. We actually did on the, trying to figure out how to put it [video] on the flash drive, but we couldn't figure it out." Schmidt also acknowledged that he did not ask the Carbondale police for help in downloading the surveillance video from the afternoon of the burglary. Schmidt testified that he asked his "IT person" to burn the video clips onto a compact disc, but he did not ask the IT person to export the complete video from the surveillance system. Schmidt testified that the video surveillance recording would have been available for 48 hours, but no one from the police department or the prosecutor's office asked to retrieve it.

¶ 112     With regard to the clips that were made from the cellphone, Schmidt testified that there were two clips—one at approximately 1:45 p.m. and one at about 2:10 p.m. Schmidt acknowledged that approximately 20 minutes of footage between the two clips was not preserved, but he indicated that he watched that footage as the video recording was played. Schmidt testified that his wife e-mailed the video clips from her iPhone to his business e-mail account and the IT person transferred the e-mailed clips to the compact disc. This testimony regarding the duplication process was somewhat different than what Schmidt had said during his direct examination.

¶ 113     After some back and forth between the State and defense counsel regarding the 20-minute gap between the two video clips and what was displayed on the original video footage, the following brief exchange occurred between defense counsel and Schmidt:

        "[DEFENSE COUNSEL]: But on the original that was on the camera system, are there other people captured on that recording for that day walking in the hallway?

[SCHMIDT]: Yes. There's, there are a lot of people on that."

¶ 114     On redirect, Schmidt was asked whether the defendant was in front of Whittington's apartment. Schmidt stated that, prior to 1:53 p.m., the defendant and his wife were in front of Whittington's apartment door and that, between 1:53 p.m. and 2:14 p.m., no one, other than the defendant, was seen in front of Whittington's apartment.[3]

¶ 115     At the conclusion of Schmidt's testimony, defense counsel objected to the introduction of the two video clips. Defense counsel argued that the admission of two 20-second video clips, taken out of an entire day of surveillance footage, violated the completeness doctrine because the defense did not have access to the entire, original surveillance video. Counsel claimed that the defense was left with two videos that had been "cherry-pick[ed]" when the Carbondale Police Department could have obtained the entire video footage. Counsel also claimed that the admission of these two clips was prejudicial because the jury would not be afforded the opportunity to view the entire video.

¶ 116     Defense counsel further argued that the two iPhone clips were not originals or duplicates under the Illinois Rules of Evidence because they did not accurately reflect or reproduce the original's data. Counsel relied upon Rules 1001 through 1004 of the Illinois Rules of Evidence (Ill. Rs. Evid. 1001-1004 (eff. Jan. 1, 2011)), all of which pertain to the admission of recordings and duplicates, in support of his argument. Counsel described the two, nonconsecutive clips as "a recording of a recording that got recorded on a DVR, then got recorded on his wife's iPhone, who's not here to testify, then it got recorded or e-mailed to Mr. Schmidt's iPhone, then that was transferred to a DVR." Counsel claimed that the Illinois Rules of Evidence required production of the original or an exact duplicate of the original and that, here, there was "less than 40 seconds out of a whole 24-hour video." Counsel further claimed that the entire video constituted the "original," and that the failure to produce the entire video denied the defense a chance to view exculpatory evidence.

¶ 117     Defense counsel next argued that the admission of the two video clips was barred under Illinois Rule of Evidence 1004 (eff. Jan. 1, 2011) because the original surveillance video was lost or destroyed as a result of inaction by the investigating officer. Counsel asserted that Detective Michael McCrary, a member of the Carbondale Police Department, was on the case as of July 29, investigating the circumstances of the alleged residential burglary, and yet never requested the entire original surveillance video. Counsel concluded that the police made no effort to preserve the original video recording during the time that recording was under the control of Schmidt.

¶ 118     Finally, defense counsel objected to admission of the video clips, arguing that the State failed to lay a sufficient foundation under the "silent witness" theory. Summarizing Schmidt's testimony, defense counsel pointed out that Schmidt admitted that he was not competent to export the entire video, that Schmidt tried to read the instruction manual but could not figure out how to export the entire video from the DVR, and that Schmidt did not request help from his own IT person. Defense counsel claimed there was no real "chain of custody," as the entire

---

[3]At one point, Schmidt testified that the video showed the defendant touching the doorknob, presumably of Whittington's apartment, and then showed the defendant walk down the hallway. Schmidt further testified that the defendant was not seen again on the clips until "the next thing you see is him [the defendant] walking out of the apartment, which was a little confusing because you never see him go in."

process—from copying the images to an iPhone, then sending the images by e-mail, and then getting the images from the e-mail or Schmidt's iPhone to the compact disc—involved other persons who had not testified. Two of the witnesses—the defendant's wife and the IT person— were missing witnesses in the series of events that ultimately resulted in the creation of these two video clips.

¶ 119 At the conclusion of the arguments by counsel, the trial court admitted the two video clips, stating,

> "Based upon what the Court's considered, in a perfect world, we would have clear and complete videos of every situation, clear and complete and clean chain of custody. Unfortunately, we do not work in a perfect world and cases do not arise and are not handled in a vacuum or in a perfect world."

The court made no other findings as to defense counsel's arguments regarding the completeness doctrine, the Illinois Rules of Evidence, or the silent witness theory.

¶ 120 In my view, there are two critical issues before this court. The first is whether there was an adequate foundation for the admission of the two, 20-second video clips under the "silent witness" theory. The second is whether, under the Illinois Rules of Evidence, the admission of the video clips was unfairly prejudicial to the defendant. After reviewing the record, I find that an adequate foundation was lacking in that Schmidt was not competent to operate his video surveillance system, there was insufficient explanation regarding the copying and duplication of the video clips, and the chain of custody was not clearly established. In addition, under the circumstances presented in this case, the admission of the video clips was unfair to the defendant. As a result, I find that the trial court erred in admitting the video clips into evidence.

¶ 121 In considering the admissibility of the video clips, I believe that *People v. Taylor*, 2011 IL 110067, is instructive in this analysis (*supra* ¶ 52). *Taylor* is the seminal case on the admissibility of surveillance video recordings, and I do not agree that a discussion of the *Taylor* factors has been waived or forfeited. In the defendant's brief, the defendant claimed that the trial court erred in admitting the video clips because the clips violated the best evidence rule and were highly prejudicial. In response to the defendant's claims, the State argued that video clips were properly admitted because the prosecutor laid a proper foundation under *Taylor*. The State then engaged in a lengthy discussion of the *Taylor* factors. In the reply brief, the defendant addressed the State's argument, and initially asserted that *Taylor* was distinguishable. The defendant next asserted that the best evidence doctrine concerned an entirely different set of factors than those discussed in *Taylor*. On appeal, as in the trial court, the State invoked the foundational requirements in *Taylor* in support of its position that the video clips were admissible, and thereby invited our consideration of the *Taylor* factors. The defendant offered his responses to the State's arguments.[4] Therefore, I conclude that the admissibility of the video clips, including the foundational requirements, are before us and that the *Taylor* analysis offers guidance on those issues.

¶ 122 In *Taylor*, a police detective was assigned to investigate a series of thefts from an office in a high school. *Taylor*, 2011 IL 110067, ¶ 3. In the course of the investigation, the detective purchased a wireless, motion activated digital camera that was concealed within a clock radio and a DVR. The employee who sold the equipment to the detective showed him how to set up

---

[4]Rule 341(j) permits the appellant to reply to the arguments presented in the brief of the appellee. See Ill. S. Ct. R. 341(j) (eff. Oct. 1, 2020); *People v. Whitfield*, 228 Ill. 2d 502, 514-15 (2007).

and use the system. The detective also read the instructions that came with the system. He testified that the " 'camera sends a signal to the wireless transmitter which is connected to the DVR which is a digital video recorder, just like a computer drive and that records the images that the camera sees.' " *Id.* ¶ 4. The detective also testified that he tested the equipment and made sure that the camera recorded a good picture to the DVR.

¶ 123    The detective then explained that he periodically checked to see whether the surveillance system had recorded any activity. When he reviewed the first recording made by the camera, he discovered that the images on the recording were not visible due to insufficient light. To correct the problem, he placed a small lamp near the camera. When he checked the equipment a few days later, he found that the DVR had recorded a theft. The detective, along with two of the school's employees, viewed the video images and identified the defendant, Teryck Taylor, as the individual in the recording. Taylor worked at the school as a night watchman. Several days after viewing the original surveillance footage, the detective " 'made a copy of the video surveillance on the hard drive, specifically the segment where Taylor was in [the] office,' " and placed it onto a VHS tape, which was then secured in an evidence locker until the trial. *Id.* ¶ 9.

¶ 124    Prior to trial, Taylor filed a motion *in limine* to bar the State from using the tape at trial, but the motion was denied. At trial, the State sought to admit the video depicting Taylor in the office. Taylor objected, claiming that there was a 30-second "skip" in the video and there was an inadequate foundation for admitting the recording. The video at issue contained two segments. The first showed Taylor crouching behind a desk, opening a drawer, and removing a bank pouch. While doing this, Taylor was looking around. The second segment on the tape showed Taylor rising, turning, and exiting the frame of the video to the right. The detective testified that the "skip" in time occurred because there was no motion and so the recording stopped. As soon as the camera sensed motion, it started again. As to its authenticity, the detective indicated the recording had not been altered in any way. *Id.* ¶¶ 15-18. After considering the arguments of counsel, the trial court denied the objections and admitted the video recording. Taylor was convicted of misdemeanor theft, and he appealed. The appellate court reversed the conviction, finding that the trial court erred in admitting the video recording, and the State filed a petition seeking leave to appeal in the Illinois Supreme Court.

¶ 125    Our supreme court, in a case of first impression, held that under the "silent witness" theory, photographs and videotapes may be introduced as substantive evidence so long as a proper foundation is laid. *Id.* ¶ 32. The supreme court addressed the question of what factors should be considered when determining whether a proper foundation has been laid for the admission of surveillance video footage as substantive evidence. *Id.* ¶ 33. In answering this question, the supreme court set forth the following factors:

> "(1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6) explanation of any copying or duplication process." *Id.* ¶ 35.

The supreme court cautioned that the list of factors was nonexclusive. "Each case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may need to be considered." *Id.* The court further stated: "The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id.*

¶ 126    Turning now to the facts of this case, Schmidt, like the detective in *Taylor*, had only recently purchased the video surveillance system. Schmidt did not offer testimony about how the surveillance system was set up to record. He did not testify about the surveillance system's general reliability, except to say that he knew the system was working because he could access and view recordings on his phone. While the evidence was scant, to say the least, I find that it was sufficient to show that the system was functioning and generally capable of recording.

¶ 127    As to the second factor, however, the testimony of Schmidt clearly indicated he was not a competent operator of his own equipment. While it was true that Schmidt stated that he could view the surveillance video recordings on his iPhone, he was not able to download or preserve those recordings from the surveillance system itself. He had no training on the operation of the system, and he had only read parts of the instruction manual. Schmidt attempted to download the entire video from the DVR onto a flash drive, but he was unable to do so, even after referencing the instruction manual. Then, instead of seeking assistance from the police or from his own IT person, Schmidt chose to have his wife use her iPhone to film two 20- or 30-second excerpts of the surveillance video and thereafter e-mail those excerpts to other devices. In addition, while Schmidt testified that the video system included a time and date stamp, he did not offer testimony as to how he set the "time and date stamp" function. There was no testimony or other evidence to indicate that the date and time stamp was correctly set when the system was installed or that the system kept accurate time. Assuming, *arguendo*, that the date function could be used to pull up the video footage from the date of the burglary, no one testified that the time stamps on the video clips accurately corresponded with what Schmidt and his wife viewed. When it came to the operation of the video surveillance system, Schmidt's level of understanding and skill was well below that of the detective in *Taylor*.

¶ 128    The third and fourth factors to be considered in determining the admissibility of these video clips pertain to the proper copying and duplication of the videos, as well as the chain of custody involved in making the video clips. In this case, the facts are muddled as they relate to the production of these video clips and their transfer from the original equipment to the compact disc. As previously noted, the evidence regarding whether the device was operating properly was scant. As to the preservation of the video, the entirety of the footage was not preserved because Schmidt could not figure out how to download it onto a flash drive. Instead, Schmidt (and/or his wife) chose to film only two selected segments that they considered important. The result was that two 20-second clips were made, initially, using the wife's iPhone. Notably, Schmidt's wife did not testify, so there is no evidence indicating how she preserved the two video clips and no evidence indicating whether those clips were edited in any way. Schmidt testified that his wife e-mailed the video from her iPhone to Schmidt's business e-mail account. This is where the facts are truly murky. Schmidt testified that the images were on his iPhone at one point, although it is not clear how the images ended up there. It is not known how the images were transferred from Schmidt's phone to his e-mail account, or vice versa, and then to a compact disc. Indeed, Schmidt could not explain this because his IT person performed the task of burning the compact disc and the IT person was not called as a witness. This confusing sequence of events, in my view, eviscerates any reliability pertaining to the creation of the video clips and the chain of custody.

¶ 129    The lack of factual clarity also undermines the sixth *Taylor* consideration, which pertains to an explanation of the copying process. While the video may depict the defendant, there was also inconsistent testimony indicating that footage in the original surveillance video revealed

the presence of another woman, along with several people up and down the hallway. None of these people were captured in the two video clips at issue here. Based upon the testimony offered, there is simply no way to know what was actually depicted in the original surveillance video footage. The fact that other people were present at various times in the hallway compels one to question why Schmidt chose to record and preserve only those segments of the surveillance video that contained images of the defendant in the vicinity of the victim's apartment, while excluding other persons who were also in the vicinity. Schmidt was not a trained investigator, and his decisions regarding what content to record and what to omit from the original surveillance video footage raise questions about the reliability and the trustworthiness of these video clips and whether they accurately portray the entirety of what occurred on the afternoon of the burglary.

¶ 130    In light of the foregoing, I do not believe Schmidt's testimony was sufficient to lay a reliable foundation for the admissibility of the two 20-second video clips. I agree with my colleague's point, in the special concurrence, that "the ultimate issue" is " 'the accuracy and reliability of the process that produced the recording' " (*supra* ¶ 99 (quoting *Taylor*, 2011 IL 110067, ¶ 35)), but, for the reasons stated herein, I respectfully disagree with my colleague's conclusion that this process was accurate and reliable. I would further note that the two video clips were not derived from simply "editing" a lengthy video to exclude unimportant and irrelevant material. Rather, because Schmidt was not trained or experienced in operating his system, he was unable to export and preserve the complete surveillance footage. The two video clips were made using an iPhone camera—and there was no evidence as to the capability of that camera. In the absence of a reliable foundation, I find that this evidence was irreparably tainted and inadmissible and that the trial court erred in admitting it.

¶ 131    The defendant also argued that the admission of the two video clips violated the best evidence rule. I agree that each video clip constitutes a "duplicate" as defined in Illinois Rule of Evidence 1001(4) (eff. Jan. 1, 2011). Illinois Rule of Evidence 1003 (eff. Jan. 1, 2011) provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine issue is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Each clip is a 20-second snapshot produced from an original surveillance video. The record indicates that the original video was recorded on the video surveillance system's DVR. The video surveillance system was set to save the recordings for a period of 48 hours. The original video recording was not preserved by Schmidt or by law enforcement. Schmidt did not know how to download the video footage or otherwise save it, and he did not want to take the time to make an iPhone video of the complete surveillance footage. The responding police officer did not obtain a copy of the complete video because the victim had initially declined to prosecute. As a result, the video clips are snippets in time and were selected by a person who had no apparent training in criminal investigation. Considering all of the circumstances, including the lack of foundation for the video clips discussed earlier, I conclude that the admission of the duplicate video clips was unfair to the defendant.

¶ 132    For the reasons stated, I find that the admission of the video clips was error and that the error resulted in unfair prejudice to the defendant. I would vacate the defendant's conviction and remand the case for a new trial without the two video clips.